SKYLES, *Assignee*, v. BOLLMAN *et al.*, *Appellants*.

**Instructions: REVERSAL.** The judgment of the St. Louis court of appeals reversing that of the circuit court affirmed, because of the action of the latter court in giving an instruction not authorized by the evidence.

*Appeal from St. Louis Court of Appeals.*

AFFIRMED.

*Noble & Orrick* for appellants.

(1) The bill of lading was not delivered to the bank by the *distilling company*, or anyone authorized by it to deliver the same as security for the payment of the drafts, or otherwise; and hence the bank got no title for any purpose as against Bollman & O'Hara. If Blumb had no authority to *endorse* the bill of lading, surely he had none to deliver without endorsement. (2) The instruction given for appellants was proper which told the jury that if "they believed from the evidence that the drafts drawn by the distilling company on Gregory & Stagg were delivered to Skilling, Carter & Ahrenz, by the distilling company, for *collection only*, and not as collateral to secure a prior indebtedness of the distilling company to Skilling & Company, they should find for defendants." The evidence of Mr. Blumb shows that the drafts were for *collection only*, and, furthermore, it is apparent the bank did not rely upon the bills of lading as collateral, because it first had notes of Sheber, and others, then a mortgage on the distillery, then, in February, 1876, a deed to the property, for security. The distilling company drew checks on the bank without reference to the state of the account, because the bank had the deed.

*Finkelnburg* & *Rassieur* and *Garland Pollard* for respondent.

The delivery to the bank of the bill of lading, with the drafts drawn against the proceeds of the shipment attached, as security for the payment of the drafts, transferred the title to the highwines to the bank as completely and effectually as though there had been an actual delivery of the highwines themselves, subject to the acceptance of the drafts by Gregory & Stagg. *Mich. Cent. R. R. v. Phillips,* 60 Ill. 190 ; *West. U. R. R. v. Wagner,* 65 Ill. 197 ; *Broadwell v. Howard,* 77 Ill. 305 ; *Peters v. Elliot,* 78 Ill. 321 ; *O. & M. Ry. Co. v. Kerr,* 49 Ill. 458 ; *Bank of Davenport v. Homeyer,* 45 Mo. 145 ; *National Bank Green Bay v. Dearborn,* 115 Mass. 219 ; *National Bank Chicago v. Bailey,* 115 Mass. 228 ; *Newcomb v. B. & P. R. R. Co.,* 115 Mass. 230 ; *First National Bank v. Crocker,* 111 Mass. 163 ; 3 Parsons on Contracts, 487. It is not necessary that the bill of lading be indorsed on delivery, or that the name of the transferee in any manner appear upon it ; a simple, manual delivery of the bill, unindorsed, with the intention of thereby transferring the property therein mentioned, either absolutely or as a pledge to secure a draft, passes the title to the property to the transferee of the bill. *Bank of Davenport v. Homeyer,* 45 Mo. 145 ; *Peters v. Elliott,* 78 Ill. 321. An antecedent debt is a sufficient consideration for the delivery of a draft and bill of lading to secure the same. *Peters v. Elliott,* 78 Ill. 321. The person who first gets the bill of lading (though only one of a set of three) gets the property which it represents ; he need not do any act to assert his title which the transfer of the bill of lading itself renders complete, and any subsequent dealings with the others of the set are subordinate to the rights passed by that one. *Barber v. Meyerstein,* Law Reports, vol. 4, House of Lords Cases, p. 317 ; *Caldwell v. Ball,* 1

Durnford & East, p. 205 ; *Valle v. Cerre*, 36 Mo. 587 ; 3 Kent's Com. (12 Ed.), p. 208.    Instruction number two, given for defendants, was well calculated to mislead the jury.    The uncontradicted evidence in the record shows that the bank was to apply the proceeds of these high-wines to the payment of their claim against the distilling company, and it made no sort of difference whether the bank took the drafts in payment, and gave the distilling company credit at the time; or, whether they were to collect them and then give credit for the proceeds on their claim ; in either case it held the bill of lading as security, and had the right to hold the highwines as against any subsequent purchaser from the distilling company.

BLACK, J.—This cause was here before, and is reported in 73 Mo. 665.    The cause was again tried in the circuit court in conformity with the principles of law announced on the former hearing.    There was a second verdict for the defendants, from which plaintiffs appealed to the court of appeals, where the judgment was reversed, and the defendants bring the cause here by appeal.    The main facts in the case are substantially the same as when the cause was here before, and they need not be again stated.    It is now conceded that one hundred of the one hundred and fifty barrels of the high-wines were sold to the defendants, by Sherber, on the morning of the 26th of February, 1876, before the bill of lading was delivered to the bankers, Skilling, Carter & Ahrenz.    The latter received the bill of lading from Blumb long before defendants purchased the remaining fifty barrels, so that this is really the only amount now in controversy.

The additional question, not before determined, grows out of an instruction given on the second trial, at the instance of the defendants.    It is as follows: "If the jury believe from the evidence that the two drafts, each for $7,000, drawn by the distilling company on

Gregory & Stagg, were delivered to Skilling, Carter & Ahrenz by the distilling company for collection only, for account of distilling company, and not as collateral to secure a prior indebtedness of the distilling company to Skilling, Carter & Ahrenz, they will find for the defendants."

This instruction, we think, must be understood to assert the proposition that if the bank received the drafts solely for the purpose of collecting them, and without any right to apply the proceeds to the account of the distilling company, then the plaintiff could not recover. It, therefore, becomes essential to determine whether there was any evidence in the cause to justify the giving of this instruction. While it is true the evidence shows that the distilling company made a mortgage to the bankers to secure a debt of some $12,000, and subsequently, on the first of February, 1876, made an absolute deed to them of the distillery property, for the consideration of $18,000, still it shows beyond all dispute that they continued to make large advances to the distilling company from the date of the agreement, in 1874, to the date of these drafts. At this time the company was indebted to the bankers in about $18,000; of this, $12,000 had been advanced on the twenty-third of February, 1876, to enable the company to buy revenue stamps to be used in removing these two hundred barrels of highwines, of which shipment the bankers had been notified, and without this advance the highwines could not have been moved. The whole course of business between the bankers and the distilling company was that the former made advances, took the drafts of the latter, collected them and applied the proceeds in liquidation of the account. The books of the bankers were offered in evidence, and it is thought they make evidence in support of the theory hypothecated in the instruction. They show that the amount of these drafts, $14,000, was applied to the credit of the distilling company on the 26th of February, 1876, the day they were delivered to

the bank, and the overdraft was thereby reduced to about $4,000. These drafts were by the bankers transmitted to their correspondents in St. Louis and charged to them, but when they were returned protested, appropriate counter entries were made in the accounts with the correspondent.

If anything was charged by way of discount, it makes against the theory of the plaintiff. If a charge was made for collection it is of but little moment, for that is but an every day occurrence, even when advances are made on such drafts. It ought not to be forgotten that these drafts were payable to the order of the bankers. These books are, by agreement, presented here on this hearing, and among other things it is claimed they bear evidence of erasures. The books are of a system frequently found used by bankers who conduct a limited business. Some of the figures found in the column which represents the daily balance of the overdrafts, do show some evidence of having been altered, but those which show the daily debits and credits and from which the former are mathematical deductions, bear no such evidence, so far as we can see. The following testimony appears in the record: "I will ask you, Mr. Blumb, what understanding, if any, the Beardstown Distilling Company had with Skilling, Carter & Ahrenz, with reference to the disposition of drafts drawn by the company against shipments. I see on the 25th of February, for instance, as on the 16th of July, you say you drew drafts on Bollman & O'Hara for some three thousand and odd dollars; how did you happen to draw that draft, what was done, and why did you draw it?" A. "We sold them fifty barrels of wine." Q. "Who did you sell it to?" A. "J. A. Marks & Son; but it was shipped to Bollman & O'Hara; it was so ordered." Q. "Well, who negotiated that sale?" A. "Well, it was done by letter and telegram to the company." Q. "With whom at Beardstown was the negotiation made, the distilling company, or Skilling, Carter & Ahrenz?"

A. "The distilling company." Q. "When you sold it you got the bill of lading?" A. "Yes, sir." Q. "To whom was that whiskey consigned?" A. "Bollman & O'Hara." Q. "You got the bill of lading, then what did you do?" A. "I went to the bank and made a draft for the amount and placed it in the hands of the clerk." Q. "Your draft in their favor?" A. "Yes, sir." Q. "For what purpose did you put the bill of lading in the hands of Skilling, Carter & Ahrenz?" A. "For collection." Q. "As soon as the draft was paid you would get credit for the whiskey?" A. "Yes, sir." Q. "And if the drafts were not paid would you get credit?" A. "No, sir, we would not; and if we had credit they would be certain to charge it back to us." Q. "Now, in these transactions, these drafts drawn on Gregory & Stagg were the same things, were they not?" A. "Yes, sir." Q. "Well, they were not paid?" A. "The last ones were not, it seems." Q. "Have you any credit for the amount?" A. "I don't know about that; I don't think we have. I don't see their books." Q. "Were they left with them in the same manner as the Bollman & O'Hara drafts?" A. "There was no other arrangement made; it was done as theretofore."

The deposition of this witness was read by the plaintiffs. He was also examined at length by both sides. We have examined his entire testimony, and made this copious extract because the instruction seems to stand on this testimony alone. Beyond doubt, the bankers did receive the drafts for collection, in a measure, and had a right to charge them back, if not paid, but it does not follow that they had no other interest in them than mere collecting agents. As we view this evidence, it does not show or tend to show, that these bankers took the drafts for the sole purpose of collecting them and paying the proceeds to the distilling company, without regard to the overdraft or state of the account of the distilling company. Such a conclusion is at war with the general

purport of the testimony of this witness, as we understand it from this record. It follows that the judgment of the court of appeals must be affirmed, and it is so ordered. The other judges concur.