Conrad v. Fisher.

JULIUS CONRAD *et al.*, Appellants, v. JOHN J. FISHER *et al.*, Respondents.

JULIUS CONRAD, Administrator of HELENA PAULSEN, Appellant, v. JOHN J. FISHER *et al.*, Respondents.

HENRY SCHLOETER, Appellant, v. JOHN J. FISHER *et al.*, Respondents.

St. Louis Court of Appeals, January 2, 1889.

1. **Vendor's Lien:** NOT A RIGHT OF RESCISSION. The right to enforce a vendor's lien in respect of goods sold upon a credit is not a right to rescind the contract of sale, but is a right to detain the goods until the indebtedness for the purchase price is discharged at or before the expiration of the credit, and, if not so discharged, to sell them and apply the proceeds of their sale to the liquidation of the indebtedness.

2. ———: NOT WAIVED BY TAKING OTHER SECURITY. It is an additional security for the payment of the purchase price, and is not waived by the act of the vendor in resorting to any other security which he may have, provided such security is not in itself a security of such a nature as waives or discharges the lien.

3. ———: CONVERSION: ATTACHMENT: EVIDENCE TO SHOW A CONVERSION BY ONE OF SEVERAL ATTACHING CREDITORS. A collection of facts stated, in which it appeared that several attachments were sued out by different creditors of a common debtor, apparently at the same time, all of them acting through the same attorney; that the different writs came into the hands of the sheriff within a few minutes of each other; that they were all levied on the following day, apparently at the same time; and that subsequently, on motions of the several plaintiffs, the suits were consolidated and proceeded to judgment together. It is *held* that this evidence exhibited such a concert of action as authorized the trier of the facts to find that all the attaching creditors were joint actors, and that either of them was guilty of a conversion in case any of the levies should be adjudged tortious.

4. **Pledge**: CHATTEL MORTGAGE: DELIVERY OF BILL OF SALE, WAREHOUSE RECEIPT, ETC. The delivery, as collateral security, of a bill of sale, copies of gaugers' returns, and a warehouse receipt of whiskey held in the United States bonded warehouse, creates a pledge, and not a chattel mortgage.

5. ———: PLEDGE MAY BE CREATED BY SYMBOLICAL DELIVERY. Where, from its situation, personal property is not susceptible of actual delivery, manual delivery is not essential to the creation of a pledge; it may be created by a symbolical delivery,—as by the delivery of a bill of parcels and a warehouse receipt.

6. ———: ATTORNMENT OF WAREHOUSEMAN NOT NECESSARY. The English doctrine which, in the case of a pledge by a symbolical delivery, requires an attornment by the warehouseman or other custodian of the goods, in order to create such a delivery as will support the pledge, is not in force in this country.

7. ———: WAREHOUSE RECEIPT: FOR GOODS STORED IN THE WAREHOUSE OF THE RECEIPTER. The owner of goods stored in his own warehouse cannot make a valid pledge of them, by issuing to another an instrument in the form of a warehouse receipt, in which he professes to hold the goods for that other. Such an attempt to create a pledge is void, as being contrary to the provisions of our statute relating to chattel mortgages, which requires a delivery of possession or a recording in the office of the recorder of deeds. (R. S. 1879, sec. 2503.)

8. **Foreign Law**: PROVED AS A FACT. The law of a sister state of the American union is a foreign law in the sense that it is not judicially noticed in the tribunals of this state, but must, in order to have effect here, be proved as a fact.

9. ———: PRESUMPTION IN CASE NOT PROVED. The burden of proving the law of another state rests upon the party claiming rights under it, and, in the absence of such proof, the trial court is authorized to presume that the same rule of law, which obtains in this state, obtains in that state, it being founded in the principles of the common law, and not the necessary outgrowth of a local and peculiar statute.

10. **Contract**: INTERPRETATION: PRIOR COURSE OF DEALING. Where a contract is in writing and is so distinctly drawn as to leave no ambiguities for parol explanation, evidence of a prior course of dealing between the parties to it, and especially of a prior course of dealing between one of the parties to it and the predecessors of the other party,—cannot be appealed to to supply an interpretation of it.

11. **Subsequent Parol Variation.** But it is competent to show that the parties in their dealings under the contract varied its terms by a subsequent parol agreement.

12. **Practice, Trial:** VENDOR'S LIEN : WHEN A QUESTION OF FACT. Where the facts are numerous and equivocal—susceptible of different inferences in respect of the question what was the real intent of the parties,—the question whether there has been such a delivery as divests the vendor's lien is a question of fact for a jury.

13. **Practice, Appellate:** CONCLUSIVENESS OF FINDING OF TRIAL COURT ON THE FACTS. In such a case, in an action at law, the inferences of fact made by the trial court are not reviewable on appeal, provided they are fairly within the scope of the evidence.

14. **Vendor's Lien, Incidents of:** THE LEADING INCIDENTS OF A VENDOR'S LIEN STATED. That it presupposes title in the vendee; that it is not a right of rescission, but of detention; that it arises by implication of law while the goods remain in the possession of the vendor and the purchase price is unpaid; that it is waived by stipulations in the contract of sale inconsistent with its exercise, as by giving time for payment and taking a negotiable security therefor; that this waiver takes place on the implied condition that the vendee will keep his credit good during the term of the credit; that it revives if, during such term, the vendee becomes insolvent, and that the insolvency, which revives it, is insolvency in the mercantile sense—an inability to pay one's debts as fast as they mature.

15. ——: BY WHAT DELIVERY DIVESTED: STATUTE OF FRAUDS. It is not a universal rule that the delivery of the goods which divests the vendor of his lien must be such a delivery, actual or constructive, as would amount to an "actual receipt" of the goods within the meaning of the seventeenth section of the English statute of frauds; nor is it a safe test in determining whether this lien has been divested to consider whether there has been such a delivery.

16. ——: CONSTRUCTIVE DELIVERY: NOT DIVESTED BY CONSTRUCTIVE DELIVERY, WHEN. As between the vendor and vendee, and in cases where the rights of subsequent purchasers of the vendee are not concerned, this lien is not divested by any species of constructive delivery, so long as the vendor retains the actual custody of the goods, either by himself or by his agent or servant.

17. ——: INVOICING THE GOODS. This lien is not destroyed by invoicing the goods to the purchaser.

Conrad v. Fisher.

18. ———: MARKING THE PACKAGES. Nor is it destroyed by marking the packages with the purchaser's name. So *held* where the goods consisted of barrels of whiskey distilled in a distillery, which, by an arrangement between the contracting parties, sanctioned by the agents of the government, was run in the name of the vendee, and the barrels furnished by the vendor were branded with the name of the vendee as distiller and placed in the distillery warehouse.

19. ———: AGREEING TO HOLD THE GOODS AS WAREHOUSEMAN FOR VENDEE. Nor is this lien destroyed by an agreement between the vendor and vendee that the goods shall remain in the warehouse of the vendor subject to the payment of storage by the vendee. The doctrine of *Barrett v. Goddard*, 3 Mason (U. S.) 107, on this subject, denied, and the decision criticised.

20. ———: SOMETHING REMAINING TO BE DONE TO THE GOODS BY THE VENDOR. The fact that, by the agreement between the vendor and vendee, something remains to be done to the goods by the vendor, is not conclusive that there has not been such a delivery as cuts off the vendor's lien, but creates a *prima facie* presumption to that effect, which may be rebutted by circumstances. If the thing remaining to be done was intended to prepare the goods for delivery, the lien continues; but if the facts essential to a delivery have taken place, and the thing remaining to be done is merely in the nature of a subsequent service by the vendor with reference to the goods, the lien is discharged. When, therefore, the goods, at the time the contract of sale is made, though in the legal custody and control, are not in the actual possession of the vendee, but are so situated that he cannot obtain actual possession until a specific act is done by the vendor, if the vendee becomes insolvent before this act has been done, and the actual possession of the goods has not been changed, the vendor may detain the goods as security for the payment of the contract price.

21. ———: NOT DESTROYED BY PLACING GOODS IN GOVERNMENT WAREHOUSE. The lien of the unpaid vendor for distilled spirits is not destroyed by placing them in a government warehouse in charge of a government store-keeper. The custody of the government store-keeper is intended merely to secure the government in its revenue, and not to interrupt or impair the rights of any vendor, vendee or pledgee, beyond what the terms of the statute under which he holds possession absolutely require.

22. ———: CASE IN JUDGMENT. Where the contract stipulated for the doing of three things by the vendor before the delivery should be complete: (1) To give care and attention to the packages while in

Conrad v. Fisher.

the government warehouse, the same being the distillery ware-house of the vendor; (2) to place insurance upon the property, if so required by the vendee; (3) and, finally, to complete the delivery of the property itself by placing it free of charge on board the cars,—it was *held* that, presumptively, there had been no actual delivery until the last of these three things had been performed, unless the other circumstances surrounding the transaction were such as to repel the presumption, and whether they were was a question of fact.

23. ———: UNITED STATES INTERNAL REVENUE LAWS: DELIVERY TO THE "OWNER" WHEN TAX PAID. In the provisions of the revenue laws of the United States, which require the delivery of distilled spirits by the government warehouseman to the *owner* when the tax is paid, congress merely intended, by the use of a general word of description, to designate, without circumlocution or needless specification, any person who, upon the payment of the government dues, is in law entitled to the possession of the goods.

24. **Vendor's Lien:** NOT SELF-EXECUTING. The lien of an unpaid vendor of goods is not self-executing. It is a right which he may or may not assert, and which, if not asserted in time, is lost. If, therefore, the vendor, retaining the goods under a contract with the vendee in the vendor's distillery warehouse, allows the vendee to call the warehouse his own for the purposes of his trade, and to issue warehouse receipts in respect of the goods, the license thus given to the vendee to issue warehouse receipts does not, *ipso facto*, expire upon the happening of the vendee's insolvency.

25. **Pledge:** AS SECURITY FOR ANTECEDENT DEBT: PLEDGEE NOT A BONA FIDE PURCHASER FOR VALUE. Where goods which have been sold on credit remain in the possession of the vendor under such circumstances that his lien will revive upon the happening of the insolvency of the vendee, a pledge of the goods by the vendee to his creditor, as collateral security for an antecedent indebted-ness, the creditor parting with no new value and making no agreement for delay, does not constitute the pledgee a purchaser for value, in such a sense as gives him a better right in respect of the goods than his pledgor and cuts off the lien of the unpaid vendor.

26. ———: WHEN PLEDGEE CANNOT INVOKE ESTOPPEL. In such a case the pledgee of the vendee cannot be regarded as having a better right than the vendee, on the principle of estoppel, unless he shows that what has been said or done by the vendee has in some way influenced the conduct of the pledgee to his detriment. The law will not presume, in the absence of evidence, that such was the fact.

Conrad v. Fisher.

27. **Practice, Appellate:** AFFIRMANCE BECAUSE FOREIGN LAW NOT PROVED. Where the rights of the parties depended upon the law of Kentucky, and this circumstance was not brought to the attention of the trial court by either party, and such law was not proved as a fact, the court declined to affirm the judgment as being for the right party, on the theory that the pledge, under which the plaintiffs claimed, was not by the law of Missouri a valid pledge, when the court knew, as a matter of general learning, that it was a valid pledge under the law of Kentucky. On the other hand, the court declined to reverse a judgment for the defendants which rested on the ground that the title of the plaintiff was that of a pledgee of warehouse receipts as collateral security for an antecedent debt,—the law of Missouri on the subject being unsettled, and the law of Kentucky, by which the rights of the parties was governed, which had not been put in evidence in the trial court, being, on the analogous subject of commercial paper, that a pledgee for an antecedent debt is not a taker for value, but holds subject to prior equities.*

*Appeal from the St. Louis City Circuit Court.*—HON. GEO. W. LUBKE, Judge.

AFFIRMED.

*David Goldsmith,* for the appellants.

*Silas B. Jones,* for the respondents.

THOMPSON, J., delivered the opinion of the court.

This case has been argued three times at very great length and with much ability on both sides,—the last time before the two judges who alone participate in this decision. Two other actions, Julius Conrad, Administrator of Helena Paulsen, appellant, *v.* John J. Fisher *et al.*, respondents, number 3711, and Henry

---

*The above *syllabi* were prepared by Judge THOMPSON at the request of the reporter. The publication of the opinion at the end of the decisions of the St. Louis court of appeals for the March term, 1889, is due to the fact that the motions for rehearing, filed by the appellants, were not decided until the close of that term

Schloeter, appellant, *v.* John J. Fisher *et al.*, respondents, number 3712,—have also been argued and submitted together with this case.  The three actions are of the same nature, arising out of the same transaction, and depending upon the same principles of law.  They were tried together before the same judge sitting as a jury, and judgments in all of them were entered for the defendants.  They are presented in this court for review upon a single bill of exceptions, by a stipulation of the parties.  This opinion will dispose of the other two cases, as well as of this case.

Each of these three cases is an action for the conversion of certain whiskey at Silver Creek, in Richmond county, Kentucky.  The facts, so far as it seems necessary to state them at the outset, were as follows : During the time when the rights in controversy arose, Charles W. Conrad was doing business in St. Louis, Missouri, under the name and style of C. Conrad & Co. The defendants were partners in two different firms (Gregory, Stagg & Co. and W. S. Hume & Co.) engaged in the business of distillers and rectifiers at Silver Creek, Kentucky.  A third firm, Stagg, Hume & Co., and also the two firms above named, of which they were successors, had had a course of dealing with C. Conrad & Co., similar to that which took place under the contract hereafter set out upon which the rights now to be disposed of depend.  There is a great amount of testimony in the record as to the nature of this course of dealing, and 'the facts adduced by this testimony are set out at considerable length by the appellants in their statement, of which we shall speak hereafter.

As introductory to the contract itself, it may be stated that Conrad, doing business at St. Louis under the name of C. Conrad & Co., had acquired an extensive reputation for a certain kind of beer, which had been brewed and bottled for him in St. Louis, and which he had sold under the name of Budweiser beer.  He desired

to found a similar reputation in respect of certain kinds of whiskey; but, as he was not a distiller, it was necessary to find a distiller who would make for him whiskey of the desired grade, and who would assist him in holding himself out to the world as the distiller of it. The defendants were. willing to make such whiskey for him and to assist him in representing himself to the public as the distiller of it. In order to carry out this purpose, the following contract was entered into :—

"This agreement made and entered into this twenty-fifth day of October, 1882, between Stagg, Hume & Co., of St. Louis, Missouri, of the first part, and C. Conrad & Co., of St. Louis, Missouri, of the second part, witnesseth :

"That the party of the first part agrees to make for the party of the second part, during the months of November and December, 1882, and January, 1883, at the Silver Creek distillery in Madison county, Kentucky, twenty-one hundred barrels of Moss Rose Sour Mash Bourbon whiskey, and four hundred barrels Governor's Choice Rye whiskey, at forty-six and one-fourth cents per proof gallon for the Bourbon, and sixty-two and one-half cents per proof gallon for the Rye—the Bourbon to be invoiced when all made, and the Rye to be invoiced when all made, as per return of United States gauger on duty at distillery.

"That during the manufacture of the whiskey, herein contracted for, the firm name of the party of the second part (Conrad & Co.) shall be used as distillers, provided that the said party of the second part shall not, in any way, be held responsible or liable to the United States government for the conduct of the distillery.

"That settlement for the whiskey shall be made as follows :. The party of the second part shall give their notes, or acceptances, each for six hundred dollars, payable, the first note on June 16, 1883, and a note

payable on the Saturday of each week following, until all are paid. That the whiskey shall be of the standard quality of the "Hume" brand, the cooperage first class, eight-iron-hooped barrels, well charred, branded with the firm name of the party of the second part as distillers—all brands required to be furnished by the party of the first part—the packages to contain from forty-six to fifty gallons each, and the proof of the whiskey to run as nearly uniform at one hundred and one per cent. as it is possible to make it.

"That storage shall be charged at the rate of five cents per barrel per month from date of entry into United States warehouse number 541, eighth district of Kentucky, and that all care and attention shall be given the packages while in store by the party of the first part.

"That, upon the release from bond and payment of United States and state taxes and storage by the party of the second part, packages shall be delivered, free of charge, by the party of the first part, on board of the cars at Silver Creek, Kentucky.

"That the party of the first part, if desired to do so by the party of the second part, shall place insurance, loss, if any, payable to the party of the second part, who shall pay the premium at not to exceed current rates.

"That, if from fire or other casualty, the party of the first part shall be unable to comply with the terms of this contract in full or in part, the said party of the first part shall not in any way be held liable for such non-fulfillment of contract.

"That, when the whiskey is all invoiced and the notes are given for the amount, the party of the first part agrees to pay to the party of the second part two hundred and fifty dollars, in consideration of which the party of the second part agrees to give the party of the first part two cases containing twelve quart bottles of the best French champagne and two casks of Budweiser beer.

" Witness our hands this twenty-fifth day of October, 1882, at St. Louis, Mo.

"(Signed) STAGG, HUME & Co.,
"C. CONRAD & Co."

The whiskey in controversy was made (or caused to be made in the manner hereafter stated) by Stagg, Hume & Co., under this contract, and was placed in United States bonded warehouse number 541, as therein provided for. On the ninth of February, 1883, Conrad, being in failing circumstances and being indebted to these plaintiffs in various amounts which had long been due, delivered to each one of them, without their solicitation, a warehouse receipt for a quantity of this whiskey, as collateral security for the indebtedness owing to them, they asking him no questions and he making to them no statements at the time as to why he did this. On the sixteenth of the same month he suspended payment and his insolvency became known and published; and on the twenty-fifth he made an assignment for the benefit of his creditors. Meantime the plaintiffs had taken no steps to withdraw the whiskey from the government warehouse, but merely held the warehouse receipts, parting with no new value for them. The notes given by Conrad to Stagg, Hume & Co. for the whiskey were in their possession, not negotiable, and unpaid at the time of his suspension. Conrad was insolvent to the extent that, although much of his indebtedness was secured, his unsecured creditors received from the administrator of the unpledged assets of his estate no more than ten cents on the dollar.

Soon after his suspension, Stagg, Hume & Co. sued out an attachment in Richmond county, Kentucky, to enforce a vendor's lien upon the whiskey. The other two partnership firms already named (Gregory, Stagg & Co. and W. S. Hume & Co.), of which two firms the defendants were members, being creditors of Conrad on other accounts, sued out other attachments. These

attachment suits were, by agreement of the various attaching creditors, consolidated, and in the consolidated suit judgment was rendered for the plaintiffs, fixing their respective priorities. The property was sold thereunder; and, although Stagg, Hume & Co. proved up their claim as holders of the notes given by Conrad for the purchase price of the whiskey before the assignee of his estate, and received a dividend in common with the other creditors, yet the total amount which was realized from the sale of the whiskey in Kentucky in the various attachment suits, added to the dividend thus received by them, was not sufficient to liquidate the indebtedness evidenced by the notes given by Conrad to them for the purchase price of the whiskey.

We understand it to be the settled law that the right to enforce a vendor's lien, in respect of goods sold upon a credit, is not a right to rescind the contract of sale, but is a right to detain the goods until the indebtedness for the purchase price is discharged at or before the expiration of the credit, and, if not so discharged, to sell them and apply the proceeds of their sale to the liquidation of the indebtedness. *Babcock v. Bonnell*, 80 N. Y. 244; *Chandler v. Fulton*, 10 Tex. 2; s. c., 60 Am. Dec. 188, 199; *Newhall v. Central Pacific Railroad*, 51 Cal. 345; s. c., 21 Am. Rep. 713. It is an additional security, and is not waived by the act of the vendor in resorting to any other security which he may have, provided such security is not in itself a security of such a nature as waives or discharges the lien. Hence, there was nothing incompatible in the act of Stagg, Hume & Co., in proving up their claim before the assignee of Conrad, and receiving a dividend from his estate in its administration, under the assignment law of Missouri, in common with other creditors, and in their also proceeding by such means as the law of Kentucky left available to them to enforce their vendor's lien upon the whiskey in the bonded warehouse at Silver Creek in that

state; nor is such a contention made on behalf of the plaintiffs. Moreover, as they did not realize enough from both sources—that is, from the dividends received from Conrad's assignee and from the proceeds of the sale of the whiskey under their attachment in Kentucky, to satisfy the notes given for the purchase money, it must follow that, if they had a vendor's lien which they were entitled to enforce against the whiskey, the existence of such a lien is a complete defense to these actions for conversion, provided the title of the plaintiffs is not better than that of Conrad, their transferor. The strength of this conclusion has been seen by the learned counsel for the plaintiffs, and therefore his chief effort has been to convince the court that Stagg, Hume & Co. had no vendor's lien upon the whiskey in controversy.

Before proceeding to the consideration of the question, it is necessary to get out of the way two other objections raised by the defendant; because, assuming that these objections properly arise upon the record, if they are well taken, they require an affirmance of the judgment, which was given for the defendant, irrespective of the question whether or not Stagg, Hume & Co., had a vendor's lien upon the whiskey.

I. The first of these objections is that there is no evidence in the record tending to show a *conversion.* In order to understand the grounds upon which this objection is placed, it is necessary to recall the facts that the whiskey was seized under four attachments, simultaneously levied upon it at Silver Creek, Kentucky, by three different firms; that these firms were composed in the aggregate of numerous parties, and that the two defendants who alone are sued in these actions (process having been returned as to the others "not found"), are James A. Gregory and John J. Fisher, neither of whom was a member of the firm of Stagg, Hume & Co., the makers (through the Silver Creek Distilling Company) of the whiskey under the contract

with Conrad above set out. These three partnership firms were Stagg, Hume & Co., composed of Stagg, of Hume and of Taylor, Jr.; W. S. Hume & Co., composed of Fisher, Gregory, Stagg, Hume and Embry; and Gregory, Stagg & Co., composed of Gregory, Stagg, Fisher and Hume. The defendants Fisher and Gregory were members of the firm of W. S. Hume & Co., and also of the firm of Gregory, Stagg & Co. On January 23, 1883, four suits were instituted by these various firms against Charles W. Conrad, in the court of common pleas in Madison county, Kentucky, two of them known as number 1 and number 2, by Stagg, Hume & Co., the makers of the whiskey and the parties of the first part in the contract above set out; one of them by W. S. Hume & Co., and one by Gregory, Stagg & Co. In all these suits attachments were sued out against the property of Conrad. In the suit of Stagg, Hume & Co., known as number 1, the effort was to enforce a vendor's lien upon the whiskey in controversy. The writ of attachment issued in this suit came into the hands of the sheriff of Madison county, Kentucky, at three minutes past ten o'clock in the evening of the same day; the writ in the action of W. S. Hume & Co. came into his hands at ten minutes past ten o'clock in the evening of the same day; and the writ in the action of Gregory, Stagg & Co. came into his hands at twelve minutes past ten o'clock in the evening of the same day. The three writs were all levied, on the next day, on the whiskey in controversy, by a notice to the person in charge of the warehouse where it was stored. Possession of the whiskey was never taken nor disturbed under any of the writs. The cases were managed for the several plaintiffs by the same attorneys. They were consolidated for trial, and judgment was given, setting out the rights of each of the plaintiffs, there being other whiskey involved besides that in controversy here, and adjudging a prior right and lien in favor of Stagg,

Hume & Co. to the whiskey in controversy, which was sold to satisfy their lien, but which, as already stated, did not bring enough to satisfy it. Neither W. S. Hume & Co., nor Gregory, Stagg & Co., got any part of the proceeds of the sale of the whiskey in controversy. No effort was made in the court below to show that in point of fact the attachment of W. S. Hume & Co., or that of Gregory, Stagg & Co., in any way interfered with the rights of these plaintiffs. But the plaintiffs rested upon the position that what was done under the attachments was *per se* a conversion of the whiskey in controversy, and the defendants now insist that such is not the law. The circuit court adjudged this point against the defendants, and we are unable to say that its conclusion was wrong. It is clear to our minds that there was here evidence tending to show such a concert of action among the four attaching creditors as placed all of them in the position, if the attachments were wrongful, of co-trespassers or joint tort-feasors, within the meaning of the rule laid down by this court at the present term in the case of *Leeser v. Boekhoff*, 33 Mo. App. 223, and the cases there cited ; and the sufficiency of this evidence was a question of fact for the trial court, sitting as a jury. It is perceived that the attachments were sued out apparently at the same time, by the parties acting through the same attorney ; that the different writs came into the hands of the sheriff within a few minutes of each other ; that they were all levied on the following day, apparently at the same time, for the hours of the several levies are not specified in the sheriff's return ; and that subsequently, on motions of the several plaintiffs, the suits were consolidated and proceeded to judgment together. The fact that the attachment which first came into the hands of the sheriff may, by operation of law, have taken precedence in the first distribution of the fund does not, we think, at all negative the conclusion that there was such concert of action as

made all the parties liable as co-trespassers, in case the levies should be adjudged tortious. The levies, it may be assumed, took effect by relation as of the respective dates when the different writs came into the hands of the sheriff. But this doctrine of relation is to be regarded as a fiction resorted to for the purpose of determining the priorities of the attaching creditors as among themselves, and not for the purpose of determining the liability of any one of them as between himself and the defendant in the attachment suit.

II. The next position of the respondent is that the delivery of the bill of sale, copies of gaugers' returns, and so-called warehouse receipts created a mere *pledge*, which was invalid, because there was no delivery. It is not disputed that these papers were delivered to the plaintiffs as collateral security, and not in payment. The transaction, therefore, constituted a pledge or mortgage. That it constituted a pledge, and not a mortgage, can scarcely be the subject of doubt. A bill of sale of chattels, absolute on its face, may, indeed, be shown by parol evidence to have been intended as a mere security for a debt. *Newell v. Keeler*, 13 Mo. App. 189. Such was the undisputed evidence here; and whether it was a mortgage or a pledge was a question of law. If it were a mortgage and not recorded, it would not be good against creditors of the mortgagor, unless accompanied by delivery. In that respect it would stand on the same footing as a pledge; for delivery is essential to the validity of a pledge. These warehouse receipts were evidently intended to make a symbolical delivery to the plaintiffs, as security for their respective debts. This would make a pledge, provided a pledge can be created by such an instrument, and by no other delivery, actual or constructive. This is shown by the following case: *Parshall v. Eggart*, 52 Barb. ( N. Y.) 367; s. c., affirmed on this point though reversed on another, 54 N. Y. 18. This view is also confirmed by numerous holdings to the

effect that taking a bill of sale or bill of parcels of personal property, absolute in its terms, as collateral security merely, amounts only to a pledge. *Walker v. Staples*, 5 Allen ( Mass. ) 34; *Thompson v. Doliver*, 132 Mass. 103; *Kimball v. Hildreth*, 8 Allen ( Mass. ) 167; *Morgan v. Dod*, 3 Colo. 551.

But it does not follow that a valid pledge can be created only by manual delivery of the property pledged. Where, from its situation, the property is not susceptible of actual delivery, a valid pledge may be created by symbolical delivery. *Ex parte Fitz*, 2 Lowell ( U. S. ) 519; Jones on Pledges, sec. 36. Thus, property in transit may undoubtedly be pledged by the deposit of a bill of lading. *Meyerstein v. Barber*, L. R. 2 C. P. 38; s. c., affirmed, *Ib.* 661, and in L. R. 4 H. L. 317. We have held in this court that goods in a warehouse may be pledged by delivery of the warehouse receipt, even without its being endorsed by the pledgor. *St. Louis Nat. Bank v. Ross*, 9 Mo. App. 399. That goods in the hands of warehouseman may be pledged by a transfer of the warehouse receipt, was again held by this court in *Fourth Nat. Bank v. St. Louis Cotton Compress Co.*, 11 Mo. App. 341, and has been held by other courts in numerous cases. Jones on Pledges, secs. 280, 298, 302, and cases cited. That goods detained in the custom house to secure the payment of duties may be pledged by a written contract noted on the books of the chief officer of the custom house without actual delivery, was held by the English privy council, reversing the Canadian court of Queen's Bench, in *Young v. Lambert*, L. R. 3 P. C. 142.

This last case, however, involves an idea which seems to be fundamental in the English law, namely, that where goods are in the possession of a third party, in order to constitute such a constructive delivery as will support a valid pledge, there must be an *attornment* by the actual custodian. SIR JOSEPH NAPIER, in giving

the judgment of the court in the case just cited, said: "It appears to their lordships that, by the express agreement of the parties in this case, followed by the acceptance of the chief warehouse keeper, there was a valid constructive delivery of the property comprised in the contract." *Ib.* 156. But our law does not seem to require an attornment in order to complete a symbolical delivery. *Davis v. Russell*, 52 Cal. 611. The decisions in this state do not give countenance to such an idea, although in Massachusetts they have followed the English rule. *Hallgarten v. Oldham*, 135 Mass. 1. But Mr. Jones, in his very satisfactory work on pledges, speaks of this decision as "contrary to the general rule." Jones on Pledges, sec. 300. We should, therefore, have no difficulty in overruling the contention of the respondents upon this point, if we could regard these instruments as warehouse receipts.

But it has been held by this court, and by several other courts, that a receipt issued by the owner of goods, *stored in his own store*, is not a *warehouse receipt* at all. *Valley Nat. Bank v. Frank*, 12 Mo. App. 460; *Thorne v. First Nat. Bank* 37 Oh. St. 254; *Adams v. Merchants Nat. Bank*, 2 Fed. Rep. 174; s. c., 9 Biss. (U. S.) 396; *Yenni v. McNamee*, 45 N. Y. 614; *Farmers Bank v. Lang*, 87 N. Y. 209.

In *Valley Nat. Bank v. Frank*, *supra*, this court held that the issue by a merchant of a receipt for goods held in his own store, in the form of a warehouse receipt, had not the effect in law of a transfer of title, by means of a warehouse receipt, as against a subsequent innocent purchaser.

In *Thorne v. First Nat. Bank*, *supra*, it was held that an instrument substantially like a warehouse receipt, issued by a debtor to his creditor, on property owned by the debtor, who was not a warehouseman, for the sole purpose of securing such creditor, was void as against other creditors, where the property remained in

the possession of the debtor. In the view which the court took, it was void as an attempt to create a lien upon personal property contrary to the provisions of the statute making chattel mortgages void unless accompanied by delivery of possession, or unless the mortgage be recorded—which statute is substantially similar to ours. R. S., sec. 2503.

In *Adams v. Merchants Nat. Bank, supra,* a similar ruling was made upon a similar state of facts and based upon similar reasons—the court holding that, in order to create a valid pledge by the transfer of a warehouse receipt, the receipt must be issued and transferred in compliance with the governing statute; otherwise, it will be regarded as in the nature of a mortgage, and void because not recorded or accompanied by the delivery of the property.

A similar ruling was made, and upon similar grounds, in *Yenni v. McNamee, supra.* This last case is also authority for the position that such an attempted pledge is not good under our statute relating to warehouse receipts. That statute recites : ''All receipts issued or given by any warehouseman or *other person* or firm * * * are hereby made negotiable,'' etc. R. S., sec. 558. The New York statute contained the same recitals, using the words ''or other persons.'' Yet it was held that a receipt issued by the owner of the goods, who held them in his own storehouse, was not a warehouse receipt; that the issuing of it to a creditor did not create a valid pledge, for want of transfer; but that it was an attempt to create a mortgage contrary to the provisions of the statute (similar to ours), requiring mortgages of chattels to be accompanied by delivery or else recorded.

In another case in the same state, a commission merchant procured a discount of his promissory note upon the following receipt as collateral : '' Received in store, for account of Messrs. P. & S., subject to their order, the following named property, as security to pay

note given this day" (describing the note and also the property thus attempted to be pledged). There was no manual delivery of the property, and no other symbolical delivery than was effected by the issuing of this receipt, but the property remained in the storehouse of the commission merchant as before. It was held: (1) That the receipt was not a chattel mortgage, and that, if it were, it was void as against the creditors of the mortgagor, because there was neither a delivery nor a recordation as required by the statute. (2) That the transaction did not, in legal effect, constitute a pledge, because it lacked the essential of delivery. (3) That the fact that the property was delivered to the attempted pledgee, before it was levied upon by the attachment under which the defendant justified, did not validate it as a pledge. *Parshall v. Eggart*, 52 Barb. ( N. Y.) 367. On appeal from this ruling, the court of appeals of the same state held that the transaction was a pledge, and that, considered as a pledge, it was validated by the subsequent delivery before the rights of the attaching creditors supervened—leaving the ruling undisturbed on the other points. See s. c., 54 N. Y. 18.

A similar ruling was made under the provisions of the civil code of Louisiana (arts. 3125, 3129), where certain attempted pledgees, having allowed the pledgor to remain in possession of the goods which he had attempted to pledge to them, by issuing to them papers by which he professed to have received the goods from them on storage, were held not entitled to the rights of pledgees against subsequent purchasers. *Geddes v. Bennett*, 6 La. Ann. 516.

A ruling of Mr. District Judge Lowell in a case in bankruptcy is to the general effect that there might be, under circumstances, a valid pledge of cumbrous material, such as locomotive engines, by the delivery of bills of sale, although the property should remain in the possession of the pledgor. *Ex parte Fitz*, 2 Lowell (U. S.)

519. But no allusion is made in that case to the existence or effect of any local statute requiring chattel mortgages to be recorded or to be accompanied by delivery, and I do not therefore regard that decision as authority in such a case as that before us. Besides, it does not seem to me to have been well decided upon its circumstances. It invests a bill of sale with the qualities which the mercantile law, for purposes of commerce, attaches to bills of lading and to warehouse receipts, and I do not find any well considered case that has gone to that extent.

But we find that it has been held in Kentucky, construing the statute of that state (Kentucky act of March 6, 1869), that a person, having goods stored in his own warehouse, may transfer title in them by issuing warehouse receipts (*Newcombe v. Cabell*, 10 Bush [Ky.] 460), and may, by issuing such a receipt, make a valid pledge to them to another,—placing such warehouse receipts on the same footing as similar receipts given by a warehouseman to the owner of the goods and by him transferred in pledge. *Cochran v. Ripey*, 13 Bush. [Ky.] 495; *Ferguson v. Northern Bank of Kentucky*, 14 Bush. [Ky.] 555. See also *Farmer v. Gregory*, 78 Ky. 475; *Greenbaum v. Megibben*, 10 Bush. [Ky.] 419. If the rights of the plaintiffs under these so-called warehouse receipts are governed by the law of Kentucky, then it is to be observed that the law of Kentucky is a foreign law which is not judicially noticed in the tribunals of this state, but which must, in order to have effect here, be proved as a fact (*Selking v. Hebel*, 1 Mo. App. 340; *Flato v. Mulhall*, 72 Mo. 522; *Meyer v. McCabe*, 73 Mo. 236; *Bergner v. Chicago, etc., Railroad Co.*, 13 Mo. App. 499); that the burden of proving what the law of Kentucky was upon this point was upon the plaintiffs; and that, in the absence of such proof, the circuit court was authorized to presume that the same

rule of law which obtains in this state, obtains in Kentucky, it being founded in the principles of the common law, and not the necessary outgrowth of a local and peculiar statute. *Meyer v. McCabe, supra; Bergner v. Chicago, etc., Ry. Co., supra.*

It is also true that the supreme court of Michigan has held (approving the ruling in the Kentucky case of *Cochran v. Ripey, supra*) that a warehouseman having property of his own in store may, by issuing a warehouse receipt, make a valid pledge of it to secure his own indebtedness. *Merchants, etc., Bank v. Hibbard,* 48 Mich. 118. But, as the case stands, we should be bound to hold, following our own decision in *Valley Nat. Bank v. Frank, supra,* and believing that attempted pledges in this form, by a person of his own property in his own warehouse, are in contravention of the letter and policy of the statute already referred to relating to chattel mortgages— that these warehouse receipts were neither valid as pledges nor as mortgages, and consequently that the plaintiffs have exhibited no title and no standing in court—were it not for the fact, that it nowhere appears that this view of the rights of the parties was brought to the attention of the court below during the trial. If it had been, the plaintiffs could have obviated it by putting in evidence the report of the Kentucky case of *Cochran v. Ripey, supra,* thereby proving that the law of Kentucky on this subject is different from our own law. In this peculiar state of the record, we do not feel authorized to affirm the judgment on this point, as being for the right party, since we know as a fact that under the law of Kentucky, by which this contract of pledge is to be governed, it was a valid pledge.

III. This brings us to the main question which has been contested, namely, whether there was such a delivery of the property as divested the vendor's lien. In order to a proper understanding of this question, it

will be necessary to state at considerable length the manner in which the parties executed the contract above set out. This statement would be less difficult, were it not for the various *aliases* under which the parties did business. The party of the first part was, as already stated, a partnership existing at Silver Creek, Kentucky, called Stagg, Hume & Co., but they executed their contract through a corporation organized under the laws of Kentucky, called the Silver Creek Distilling Company, which corporation was the owner of a distillery at Silver Creek, Kentucky, and also the owner of the government warehouse, number 541, into which, by the terms of the contract, the whiskey was to be and was in fact placed. It is perceived, by reference to this peculiar contract, that Conrad desired to be held out to the world as the distiller of this whiskey, and that Stagg, Hume & Co. were willing to assist him in holding himself out as such distiller. For this purpose, it was absolutely necessary, under the acts of congress relating to internal revenue, that the distillery should be run in the name of the assumed distiller, to-wit, in the name of C. Conrad & Co., and that the warehouse, which is an integral part of the distillery under such statutes, should be treated as his warehouse. For it must be borne in mind that, by the terms of those laws, each distillery has a warehouse, and that the spirits, as soon as distilled, must be at once conveyed to a receiving cistern (R. S. U. S., sec. 3267), whence they must, within three days, be drawn into casks, which casks must be directly removed to the distillery warehouse. As soon as the whiskey is thus removed to the distillery warehouse, each cask must be stamped with what is termed the distillery warehouse stamp, which stamp must contain, among other things, the *name of the distiller* and the serial number of the cask. With these provisions of the law in force, it would have been obviously impracticable for Conrad to attempt to hold himself out to the

public as the distiller of whiskey distilled by some one else, unless he could in some way contrive to have his own name stamped upon the barrels by the officer of the government under the provisions of this law.

It therefore became necessary, in order to maintain before the public the simulation of C. Conrad & Co. being the distillers, that the government should in some sense recognize the fact that the distillery was the distillery of C. Conrad & Co., and the further fact that the warehouse was the warehouse of C. Conrad & Co. Accordingly, the Silver Creek Distilling Company, by whose agency Stagg, Hume & Co. executed the contract, gave the statutory notice to the collector that they proposed to manufacture a certain quantity of whiskey in their distillery at Silver Creek, Kentucky, "doing business as C. Conrad & Co.;" that is to say, for a purpose of their own, the Silver Creek Distilling Company proposed, while manufacturing this whiskey at this distillery, to change their names and take the name of C. Conrad & Co.; and the officers of the government, rightly or wrongly, were willing that they should do this.

Touching this matter, the plaintiffs have argued that, under the federal statutes, the firm name of C. Conrad & Co. could not be legally used as distillers, nor could the whiskey be lawfully branded with the name of that firm as distillers, nor could any other name be lawfully entered upon the stamps of that of the distiller, without actually running the distillery for them and altogether in their name—by which we understand them to mean that, whereas the distillery could not thus be lawfully run in the name of C. Conrad & Co., without their being the distillers, therefore they must have been the distillers. But we confess we cannot understand the force of this reasoning. It seems to us that this is equivalent to saying that whereas a man cannot lawfully do wrong in a given particular, yet if

he had done wrong in that particular, therefore he has done right. Whether the distillery could lawfully be run, in the peculiar manner in which this distillery was run is a question between those who so ran it and the government of the United States, with which question we are not concerned. We allude to this merely because it is a branch of a similar line of argument upon which much contention of the plaintiffs rests; and it is just to their learned counsel to say that he seems finally to have abandoned it.

In order to carry out the peculiar provision of this contract by which C. Conrad & Co. should be held out as the distillers of this whiskey, without being in fact the distillers, it was of course necessary to keep up the simulation, in the face of the revenue officers, of C. Conrad & Co. being the distillers. With this end obviously in view, and with no other end in view, as the trial court was at liberty to find,—for any other end in view would contradict the contract and hence be absurd —the firm name of C. Conrad & Co. was put above the door of the warehouse, and it frequently happened that, when correspondence took place between C. Conrad & Co., at St. Louis, and the parties of the first part in this contract at Silver Creek, the letters were addressed by C. Conrad & Co., at St. Louis, to C. Conrad & Co., at Silver Creek; and the replies to such letters, generally written by Mr. Embry, the secretary of the Silver Creek Distilling Company, were in like manner signed C. Conrad & Co., though sometimes such letters were addressed to Mr. Embry in his own name and replied to by him in his own name. The parties of the first part to this contract, under the contract the distillers of this whiskey, the vendor's acting through the Silver Creek Distilling Company, as their agents, or they being the agents of the Silver Creek Distilling Company, it matters little which, for in either case there was a substantial identity between the parties,—were willing to call themselves C.

Conrad & Co., and to be so called themselves. In these letters C. Conrad & Co., writing from St. Louis would sometimes speak of the warehouse as *our* warehouse, and whoever would reply to the letters from Silver Creek, would speak of the warehouse as *your* warehouse.

As has already been stated, the record contains much evidence of a course of dealing in reference to the manufacture of whiskey for Conrad, between him and the two firms which were predecessors in business at Silver Creek, Kentucky, of the firm of Stagg, Hume & Co., the party of the first part to the contract now under consideration, by which the whiskey now in controversy was made. This course of dealing took place under contracts similar in their terms to the present contract, and was a similar course of dealing to that which took place under the present contract. We mention this fact because great stress has been laid upon it in the able argument which has been made at the bar and submitted to us in print by the counsel for the plaintiffs. We do not perceive what precise bearing it has on the questions which we are to consider. It could at most be relevant as bearing upon the inferences of fact which the judge of the trial court, sitting as a jury, might be authorized to draw. But it is to be observed in this connection that the rights of the parties are to be governed by the written contract which they have made, and that a prior course of dealing, especially between one of the parties and other parties, cannot, on any principle with which we are acquainted, be appealed to as affording an interpretation of this contract—and more especially so as this contract is drawn in such distinct terms as to leave no ambiguities for parol explanation. Evidence of a course of dealing *under this contract* between the parties to it stands on a different footing, since it is competent for the parties to a contract to vary its terms by a subsequent course of dealing.

There is evidence tending to show that its terms were varied, or at least supplemented, in one important particular. It nowhere confers upon C. Conrad & Co. the power to issue warehouse receipts in respect of the whiskey while remaining in the bonded warehouse at Silver Creek. And yet the evidence shows that he did issue such warehouse receipts, that some of them were returned to Silver Creek, and that deliveries of whiskeys were made upon them. The evidence in regard to his authority to issue these warehouse receipts is contradictory. The evidence in behalf of the plaintiffs tends to show that Conrad had acquired general authority from Stagg, Hume & Co., to issue warehouse receipts for whiskey in the warehouse at Silver Creek; the evidence of the defendants, on the other hand, tends to show that this authority was limited by the provision that the warehouse receipts should be returned to Silver Creek to be there registered—in other words, that Stagg, Hume & Co., or the Silver Creek Distilling Company, at Silver Creek, should have some sort of control over the matter. Conrad reported the issue of some of these warehouse receipts, by letters addressed to Embry, in "care of C. Conrad & Co.," at Silver Creek, and received replies thereto, signed by Embry, who was at the time the secretary of the Silver Creek Distilling Company.

The whiskey in controversy, when made, was deposited in the bonded warehouse number 541, at Silver Creek, in the name of C. Conrad & Co., in pursuance of the internal revenue statutes, the entry in the warehouse being made by the corporation as "The Silver Creek Distilling Company, doing business as C. Conrad & Co." The warehouse bonds were in like manner given by "The Silver Creek Distilling Company, a corporation organized under the laws of the state of Kentucky, doing business as C. Conrad & Co." These bonds were conditioned for the payment of taxes to the federal government. The whiskey was afterwards invoiced to C.

Conrad & Co., of St. Louis, and was settled for by notes in pursuance of the contract. The whiskey was in this condition when, on the ninth of January, 1883, Mr. Conrad, at St. Louis, acting under the name and style of C. Conrad & Co., issued the warehouse receipts already spoken of, under which C. Conrad & Co. purported to have received, into their bonded warehouse at Silver Creek, two hundred and seventy-five barrels of whiskey for Paulina Vogelsang, fifty barrels for Elly Conrad, fifty barrels for Helena Paulsen, and forty barrels for Mr. Schloeter. Mrs. Vogelsang was the mother-in-law of Conrad; Elly Conrad was his sister-in-law; Helena Paulsen was his mother-in-law's sister; and Schloeter had formerly been his porter. His evidence tends to show that he was indebted to them in various sums, exclusive of interest, which debts had been of long standing and without security. Without any solicitation whatever upon the part of any of these creditors, he handed to them respectively the papers purporting to be warehouse receipts, together with bills of parcels and copies of gaugers' certificates, as collateral security for the debts which he owed them respectively. He asked no concessions whatever from them on handing them these papers, and they made no concessions to him whatever.

It should be here stated that the evidence requires us to lay out of view any conception or conjecture that this was a conveyance designed by Conrad to hinder, delay or defraud his creditors; for though the preference of relatives as creditors for alleged past due indebtedness is one of the common features of business failures, so much as to require that such preferences should receive careful scrutiny at the hands of triers of the facts, yet it is to be observed that there is no evidence in this case tending to show that these debts were not *bona fide* debts, or to take the case out of the ordinary case of a debtor in failing circumstances endeavoring to

Conrad v. Fisher.

use his property to prefer some of his creditors. We wish to get the idea out of the way that we proceed upon any conception—the least possible—of these conveyances being simulated, or of their being made to the use of Conrad, and to make it clear that we deal with the rights of the plaintiffs precisely as we would deal with those rights if they were bankers whom Conrad had desired to secure for previous advances, made to him under circumstances which, in his view, rendered it obligatory upon him to secure them at the expense of other creditors. No fraud, either in fact or law, is imputable to the plaintiffs, nor is any imputable to Conrad, unless it be found in an unauthorized use of the authority which had been conferred on him to issue warehouse receipts—of which we shall speak further on.

In this connection it may be best to state, so far as they have not already been stated, the provisions of the Revised Statutes of the United States touching the custody of distilled spirits in bond before the taxes have been paid. The whiskey, removed, as already stated, to the bonded warehouse, must, within the first five days of the next succeeding month, be entered for deposit in the warehouse by the distiller or owner; and the distiller or owner must give bond for the payment, within the next three years, of the taxes due thereon. R. S. U. S. Sup., p. 530, sec. 4. It is also provided that the warehouse shall be provided by the distiller at his own expense, shall be situated on and shall constitute a part of the distillery premises, and shall be under the direction and control of the collector for the district, and in charge of an internal revenue store-keeper assigned thereto by the commissioner of internal revenue. R. S. U. S., secs. 3271, 3273. There is the further provision that it shall be in the *joint custody* of the store-keeper and the proprietor, but that it shall not be unlocked or remain open except in the presence of the

store-keeper, and that no article shall be received into
it, or delivered from it, by the store-keeper, except on
the order of the collector. *Ib.*, sec. 3274. This last
provision is supplemented by a regulation of the inter-
nal revenue department, as follows: "Whenever any
person is allowed access to the distillery warehouse,
it must be done under the immediate supervision of the
store-keeper. The distiller, or his employes, may be
allowed access to the warehouse for the purpose of
examining the spirits, repairing the cooperage, or
changing the packages to prevent waste." If the commis-
sioner of internal revenue deems the warehouse unsafe,
he may require the whiskey stored therein to be removed,
under the direction of the collector, to such warehouse
as he may designate, and may have it sold if the owner
fails to have the removal made. *Ib.*, sec. 3272. It is
further provided that, when the owner shall desire to
withdraw the whiskey from the warehouse, he may file
with the collector notice thereof, describing the whiskey,
and requesting that it be re-gauged. R. S. U. S. Sup.,
p. 534, sec. 17. A "withdrawal entry" must then be
made, stating the date of entry into the warehouse and
by whom made, together with other matters of descrip-
tion; and thereon, upon the payment of the tax, the
collector must issue his order to the store-keeper in
charge of the warehouse for the delivery of the whiskey.
R. S. U. S., sec. 3294. Thereupon the whiskey is
re-gauged, and the cask is branded with the name of the
distiller and stamped with the tax-paid stamp. R. S.
U. S., sec. 3295. Thereafter it shall not be stored nor
shall it be allowed to remain on the distillery premises.
*Ib.*, sec. 3288. There is also a provision for the with-
drawal of distilled spirits from the warehouse by the
owner for exportation, without the payment of taxes.
Sec. 3330.

Upon the foregoing facts the trial court has held
that Stagg, Hume & Co., at the time when Conrad

delivered the warehouse receipts to the plaintiffs, had such a possession of the whiskey as entitled them to a vendor's lien. The question now to be considered is, whether the facts admit of such an interpretation—not whether they do not admit of a contrary interpretation. For it is to be observed that where the facts are numerous and equivocal—susceptible of different inferences in respect of the question what was the real intent of the parties, the question whether there has been such a delivery as divests the vendor's lien, or puts an end to the right of stoppage *in transitu*, is a question of fact for a jury. *Chandler v. Fulton*, 10 Tex. 2; s. c., 60 Am. Dec. 188; *Michigan Central Railroad v. Phillips*, 60 Ill. 190, 193. On the analogous question, whether there has been such a delivery as will pass title and make an executed sale, the rule is the same. "Where the law can pronounce, upon a state of facts, that there is, or is not, a delivery and acceptance, it is a question of law to be decided by the court. But, where there may be uncertainty and difficulty in determining the true intent of the parties respecting the delivery and acceptance from the facts proved, the question of acceptance is to be decided by the jury." *Houdlette v. Tallman*, 14 Me. 400; *Glass v. Gelvin*, 80 Mo. 297, 300. More briefly, it is said : "When there is no dispute as to the facts, it is a question of law; when the evidence is conflicting, the jury must decide." *Glass v. Gelvin, supra; Hatch v. Bayley*, 10 Cush. (Mass.) 29. In the case before us the facts were very numerous, and on some points the evidence was conflicting. Interpreted in the light of the contract alone, they become comparatively simple. Interpreted independently of the contract, the inferences to be drawn from them are exceedingly doubtful. So far as they were properly susceptible of interpretation, independently of the contract, the inferences to be drawn from them were inferences of fact which addressed themselves to the judgment of the circuit judge, who

tried the case, sitting as a jury. {We cannot revise his conclusions of fact on this appeal unless we see, from his rulings upon the instructions, that he was mistaken in respect of the inferences of law to be deduced from certain facts. Here, as elsewhere, where the law characterizes a fact or a state of facts in a given way, if it appears from the record that the trial judge has characterized such fact or state of facts in a different way, it is within our office to review and correct his decision; but we have no control over his conclusions in respect of mere inferences of fact, provided they are fairly within the scope of the evidence. We shall take up, then, the leading incidents of fact which the evidence tends to show, and inquire whether the learned judge drew from them in any instance a conclusion contrary to that imputed by the law.

It may make our views clearer, if, before proceeding to do this, we state some of the established and leading incidents of a vendor's lien. To begin, it should be observed that the existence of a vendor's lien always pre-supposes that the title to the goods has passed to the vendee; since it would be an incongruous conception that a vendor might have a lien upon his own goods. In this case, the question of title is entirely out of the contest. The defense of a vendor's lien in Stagg, Hume & Co. concedes that the title to the goods had passed to Conrad.

It is next to be observed that a vendor's lien is in no sense a right of rescission. On the contrary, it proceeds in affirmation of the contract, and as a means of its enforcement. It is in the nature of a pledge raised or created by the law, upon the happening of the insolvency of the vendee, to secure the unpaid purchase money to the vendor. It is a mere right of detention and sale, to satisfy the unpaid purchase money. At the outset, in every sale, where the contrary is not stipulated, the implication of law is that the purchase price

is to be paid, as a condition precedent, before the vendor shall be obliged to part with his goods. *Bloxam v. Sanders*, 4 Barn. & Cress. 941, 948; *Michigan Railroad v. Phillips*, 60 Ill. 190, 193; *Arnold v. Delano*, 4 Cush. (Mass.) 33, 38. But this right to retain the goods until the purchase money is paid is waived by any stipulations in the contract of sale which are inconsistent with its exercise. *Pickett v. Bullock*, 52 N. H. 354. It is waived by giving time for payment, and especially by taking a bill or note to secure the payment of the purchase price. *Chambers v. Davidson*, L. R. 1 P. C. 305; s. c., 4 Moore P. C. (N. S.) 158; *Spartali v. Benecke*, 10 Com. Bench 212; *Dixon v. Yates*, 5 Barn. & Ad. 313; *Arnold v. Delano*, 4 Cush. (Mass.) 33, 39; *Throop v. Hart*, 7 Duvall (Can.) 512, 521. But this waiver is said to take place upon the implied condition that the vendee will keep his credit good until the term of the credit shall have expired. *Arnold v. Delano, supra; Thompson v. Baltimore, etc., Railroad*, 28 Md. 396, 406. If, therefore, the purchaser becomes insolvent before the goods are delivered, the lien at once revives. *Dixon v. Yates*, 5 Barn. & Ad. 313, 341; *Arnold v. Delano, supra; Throop v. Hart, supra.* Although there is some controversy as to the nature of the insolvency which will revive this right, yet it is agreed on all hands that an insolvency in the mercantile sense—an inability to pay one's debts as as they mature—evidenced by a stoppage of payment, an assignment for the benefit of creditors, a bill in bankruptcy, or the like—is sufficient. Such insolvency indisputably supervened in this case. Stagg, Hume & Co. undertook, by levying attachment on the goods, to exercise their supposed right of

There is a controversy in this case in respect of the general theory of the law as to the nature of the delivery which will divest the vendor's lien. The contention of the plaintiffs is that such a delivery, actual or constructive, as would amount to an "actual receipt" of

the goods, within the meaning of the seventeenth section of the English statute of frauds, will, in all cases, operate to divest the lien of the vendor. This position is undeniably logical; but the cases in which this statement of doctrine is found are nearly all cases, in which the question in judgment was the statute of frauds, and not the vendor's lien. It would hence be extremely hazardous to rest our judgment upon what judges, however eminent, have said in cases where they were not considering the question which we are considering. Besides, a little examination will show that this contention is not a sound one. The single case of stoppage *in transitu* proves this. By all the authorities, when a carrier receives goods from a vendor for shipment to the vendee, there has been such an actual receipt as satisfies the statute of frauds; and by all the authorities there has not been such a delivery as puts an end to the right of stoppage *in transitu*. If it is answered that the right of stoppage *in transitu* is one thing, and that the vendor's lien is another thing, it is only necessary to appeal to the judicial reports to show that the two are universally regarded as the same right exercised under different circumstances. The right of stoppage *in transitu* is said to be a mere extension of the vendor's lien. *Babcock v. Bonnell*, 80 N. Y. 244; *Newhall v. Var___* 15 Me. 319; *Mohr v. Boston, etc., Railroad*, 106 Mass___ 70; *White v. Welsh*, 38 Pa. St. 396, 420; *Loeb v. P___* 63 Ala. 243; s. c., 35 Am. Rep. 17, 19; *Newhall v. C___ Pacific Railroad*, 51 Cal. 345; s. c., 21 Am. Rep___ *___wley v. Bigelow*, 12 Pick. (Mass.) 307, 313; *Bene___ ___chaettle*, 12 Oh. St. 515, 521; *Schwabacher v. Ka___ ___App. 126, 129. It is simply the right which ___ accords to the unpaid vendor, upon the happen___ ___f the insolvency of the vendee, to resume his po___ ___on and with it his vendor's lien; and when his pos___ ___sion is resumed his rights are worked out by a sale of the goods on notice, and an application of the

proceeds to the payment of the purchase price, precisely as in the case of the vendor's lien. *Bloxam v. Sanders*, 4 Barn. & Cres. 941 ; *Boorman v. Nash*, 9 Barn. & Cres. 145; *Newhall v. Vargas*, 15 Me. 341. It follows from this statement, that, where the right of stoppage *in transitu* exists, the vendor's lien, *a fortiori*, exists. In other words, if there has been such a delivery, before the goods are started on their voyage, as cuts off the vendor's lien, there is no *transitus*, in the sense which supports the right of stoppage *in transitu*.

In view of these and other considerations, eminent judges have denied the proposition that the test, whether there has been a delivery to satisfy the statute of frauds, is a safe test of the non-existence of the vendor's lien. ROBINSON, C. J., in *Wegg v. Drake*, 16 Up. Can. Q. B. 252; MILLER, J., in *Thompson v. Baltimore, etc., Railroad*, 28 Md. 396, 407; *Townsend v. Hargraves*, 118 Mass. 325, 333. It has been held, on the most obvious grounds, that if a seller of merchandise, in order to maintain his lien for the price, refuses to permit the purchaser to take possession of it, but keeps it in his own personal custody, he thereby prevents an acceptance and receipt of it by the purchaser, such as is necessary to satisfy the statute of frauds. *Safford v. McDonough*, 120 Mass. 290. This is in accordance with what was said by HOLROYD, J., that "as long as the seller preserves his control over the goods, so as to retain his lien, he prevents the vendee from accepting and receiving them as his own, within the meaning of the statute,"—meaning the statute of frauds. *Baldey v. Parker*, 2 Barn. & Cres. 37, 44. This need not be disputed, because the converse of the proposition is not necessarily true. On the other hand, there are decisions which affirm that there may be an acceptance which satisfies the statute of frauds in the case of a parol sale, and yet which does not even pass the title to the vendee. *Pinkam v. Mattox*, 53 N. H. 600; *Dodsley v. Varley*, 12

Ad. & El. 632. So there may be a delivery such as puts an end to the right of stoppage *in transitu*, and yet no acceptance and receipt such as satisfies the statute of frauds. *Smith v. Hudson*, 6 Best & Sm. 431, 445. From the language of the statute of frauds it will be perceived that there must not only be an *actual receipt* of the goods, but there must also be an *acceptance*. This draws the question into the domain of *intent*; and the most cursory reading of the cases will show that the courts regard the question, whether there has been such an acceptance and actual receipt as satisfies the statute of frauds, as largely a question of intent. But the existence of the vendor's lien is not in an equal sense a question of intent; because, when a sale is made and executed, so as to pass title to the vendee, the vendor never intends to detain the goods, except in those cases where to do so is in accordance with the course of business which subsists between the parties (of which the books afford some instances), or unless such is the actual agreement; but in nearly all cases the intent is that the title shall pass, and that the vendee shall take the goods at his pleasure, and the corresponding expectation is that he will pay for them according to the terms of the contract. The vendor's lien is thus raised, not in pursuance of the intent of the parties, but by implication of law, in a state of things which the vendor, and presumptively the vendee, never intended nor expected. It is quite clear, therefore, that we cannot regard the test of delivery to satisfy the statute of frauds as a safe test by which to determine the existence, or non-existence, of the vendor's lien.

On the contrary, we affirm that, as between the vendor and vendee, laying out of view the rights of subsequent purchasers from the vendee, the vendor's lien is not divested by any species of *constructive delivery*, so long as he retains the *actual custody* of the goods, either by himself or by his own agent or servant. This

doctrine is supported by the best English and American adjudications. In 1877, it was said by SIR BARNES PEACOCK, in giving the judgment of the English privy council, "to be clearly settled, that unless actual possession has been delivered to the purchaser, the vendor is not deprived of his right of lien as against the assignees of the purchaser in the event of his insolvency." *Grice v. Richardson*, 3 App. Cas. 319, 323. "There is," said SHAW, C. J., "manifestly a marked distinction between those cases which, as between the vendor and vendee upon a contract of sale, go to make a constructive delivery and to vest the property in the vendee, and that actual delivery by the vendor to the vendee which puts an end to the right of the vendor to hold the goods as security for the price." *Arnold v. Delano*, 4 Cush (Mass.) 33, 38; quoted with approval in *Thompson v. Baltimore, etc., Railroad*, 28 Md. 396, 406. To the same effect is *Newhall v. Vargas*, 15 Me. 314, 319. "The lien of the vendor," says MILLER, J., "always exists until he voluntarily and utterly resigns the possession of the goods sold, and all right to detain them. So long as the vendor does not surrender actual possession, his lien remains, although he may have performed acts which amount to a constructive delivery, so as to pass the title or avoid the statute,"—meaning the statute of frauds. *Thompson v. Baltimore, etc., Railroad*, 28 Md. 396, 407. Speaking upon the same subject, it was said in a later Massachusetts case by Mr. Justice WELLS: "Regarding the sale and order for delivery as sufficient to make it effectual to pass title as between the parties, still until actual and full delivery, the seller is not deprived of his right to insist upon his lien for the price. Delivery to a carrier for transportation to the purchaser is sufficient to pass the title, and authorize the carrier to complete the delivery and make it absolute. But until so made absolute, the seller may revoke his authority and thus intercept the transmission, restore himself to

possession, and retain his lien. The same principle applies in all cases of inchoate delivery, or whatever mode of transmission of possession. Until the delivery is actual and absolute, the seller may suspend it and revoke the authority of any intermediary to perfect it." *Keeler v. Goodwin*, 111 Mass. 490, 492. "The rule," said LOWRIE, C. J., "is that, so long as the vendor has actual possession of the goods, or as they are in the custody of his agents, and while they are in transit from him to the vendee, he has a right to refuse or countermand the final delivery, if the vendee be in failing circumstances." It was, therefore, held that the rejection of evidence tending to show a constructive delivery under a contract of sale was unimportant, where the goods had not been removed after the sale, but continued in the stores and custody of the vendor until the published insolvency of the vendee. *White v. Welsh*, 38 Pa. St. 396, 420. Even where the goods were ponderous and lay by the road-side, and an agent of the vendor had pointed them out to the agent of the vendee for the purpose of delivery to him, and a minute of the transaction had been entered in the books of the vendor, charging the goods to the vendee,—it was held that this, although a complete delivery to transfer title to the vendee, did not cut off the vendor's lien upon the happening of the insolvency of the vendee, the goods remaining in the same position as when thus pointed out. *Thompson v. Baltimore, etc., Railroad*, 28 Md. 396, 404.

So, the delivery of a bill of lading, warehouse receipt, bought and sold note, delivery order, sale ticket, carrier's receipt, or any other writing intended by the parties or made by commercial usage a symbol of the goods themselves, passes constructive possession to the vendee; and, yet, nothing is more clear than that as between the vendor and vendee themselves, and in many cases as between the vendor and a sub-vendee, the latter

being a *bona fide* purchaser for a valuable consideration, such symbolical delivery does not divest the vendor's lien, provided the vendor remain in actual custody of the goods. Thus, where the goods are delivered to a carrier by the vendor for shipment to the vendee, the vendor, in the ordinary course of business, transmits the bill of lading to the vendee; but this, on the most familiar grounds, does not cut off the vendor's right of stoppage *in transitu.* In support of this statement of doctrine, we need not go further than refer to the decision of our supreme court, holding that where a sale is not made upon credit, although the goods contracted for have been set apart and identified in the store house of the vendor, and although they have been sold by the vendee to a sub-vendee, and a delivery order for them, given by the vendee to the sub-vendee, on the vendor, has been presented by the sub-vendee to the original vendor, and has been by him accepted in writing—yet, if the original vendee becomes insolvent, leaving the purchase price unpaid before the original vendor has actually parted with the goods, he may still exercise his right of lien upon them, notwithstanding the rights of the sub-vendee. In such case, the sub-vendee acquires no greater rights than his vendor, the original vendee. *Southwestern Freight, etc., Co. v. Plant,* 45 Mo. 517; denying *Whitehouse v. Frost.* 12 East, 614; re-affirming *Southwestern Freight Co. v. Stanard,* 44 Mo. 71; citing and approving *Miles v. Gorton,* 2 Cromp. & M. 504, and *Tanner v. Scovell,* 14 Mees. & W. 28. The terms of the sale, it is true, contemplated a cash payment, and this, as already pointed out, was a condition precedent to the right of the vendee to take the goods. But there can be no distinction in principle between the kind of possession which will support the vendor's lien *before it is waived,* and the kind of possession which will support it *after it has revived.*

Let us next apply these principles to the salient facts of the present case, and look more closely to see how the judicial decisions have characterized those facts.

The contract already set out required the whiskey to be invoiced, when made, to C. Conrad & Co.; and this, as already stated, was accordingly done. But it has been held that the lien of the vendor is not destroyed by invoicing the goods to the purchaser. *Miles v. Gorton*, 2 Cromp. & M. 504; *Dixon v. Yates*, 5 Barn. & Ad. 313. The superior court of the city of New York—a court, it may be stated, which has always stood high upon commercial questions,—has gone further than this, and has held, in an able and well considered opinion by CHARLES F. DALY, J., that the delivery of a bill of parcels of the goods sold, by the vendor to the vendee, does not affect the vendor's lien as to so much of the goods as remain in his possession, even as against a sub-vendee. *Hamburger v. Rodman*, 9 Daly (N. Y.) 93. The court were so well assured of the grounds upon which they decided this case that they refused to grant an appeal from their decision. We may, therefore, dismiss from further view the fact that the goods were invoiced to Conrad, and that bills of parcels, with gauger's certificates, were delivered to him.

This contract also required the goods to be marked with the name of C. Conrad & Co. as distillers, the brands to be furnished by Stagg, Hume & Co.; and the barrels were so branded. But it has been held, where the subject of the sale was rum in puncheons, which lay in the warehouse of a third person, where they had been deposited by the original vendor, that the act of a sub-vendee, with the consent of the warehouseman, in marking the initials of the sub-vendee upon them, in gauging them, and even in coopering them, did not amount to a taking possession such as divested the original vendor's lien,—though it was conceded that

taking samples and coopering were circumstances from which a jury might infer an actual delivery of the whole. *Dixon v. Yates*, 5 Barn. & Ad. 313.

This contract provided that the· goods should be stored in United States Warehouse Number 541, of the eastern district of Kentucky, and that storage should be charged at the rate of five cents per barrel per month from the date of entry, that is, that storage should be charged by Stagg, Hume & Co. against C. Conrad & Co. But while there is some discredited authority—all of it more than fifty years old—to the effect that the vendor's lien is discharged so that it will not revive on the insolvency of the vendee, by his agreeing to hold the goods as warehouseman for the vendee (*Hurry v. Mangles*, 1 Camp. 452; *Barrett v. Goddard*, 3 Mason [U. S.] 107; *Chapman v. Searle*, 3 Pick. [Mass.] 38), yet the more recent and better view is that the vendor's lien is not destroyed by an agreement between the vendor and the vendee, that the goods shall remain in the warehouse of the vendor, subject to the payment of warehouse rent by the vendee. *Grice v. Richardson*, 3 App. Cas. 319; *Miles v. Gorton*, 2 Cromp. & M. 504; s. c., 4 Tyrwh. 295. So it has been held, that, where a *part* of the goods are taken way by the vendee, and warehouse rent paid in respect of such part, this will not prevent the exercise of the right of the vendor's lien upon the remainder. In such a case, it was ruled that the charge of warehouse rent by the vendor did not constitute such a delivery as to divest his lien. *Winks v. Hassell*, 9 Barn. & Cres. 373. See, also, *Bloxam v. Sanders*, 4 Barn. & Cres. 941. This is somewhat analogous to a ruling of our supreme court under the statute of frauds, where a contract was made for the sale of cattle in the field of the vendor. The purchaser told the vendor to keep the cattle and feed them at the purchaser's expense until he should send for them. This the vendor agreed to do, but upon the condition

that, if any of them died, the purchaser should bear the loss ; to which the purchaser assented. It was held that this was no delivery to take the contract out of the statute of frauds. *Kirby v. Johnson*, 22 Mo. 354. Nor in such a case will the fact that the vendor gives to the vendee a *delivery order*, reciting that the vendor holds the goods to the order of the vendee rent free, until a date named, be such a delivery as to divest the vendor's lien. *Townley v. Crump*, 4 Ad. & El. 58.

Concerning the decisions which assert the opposing view, it should be said that the earliest of them, *Hurry v. Mangles*, 1 Camp. 452, was a *nisi prius* decision of Lord ELLENBOROUGH ; and it need scarcely be said that a *nisi prius* decision by a judge, however eminent, must have little weight, where the same question has been subsequently ruled otherwise in the same jurisdiction by a court *in banc*. The second of those cases, *Barrett v. Goddard*, 3 Mason ( U. S.) 107, was likewise a *nisi prius* decision of Mr. Justice STORY at circuit. That judge was an eminent commentator, more noted for the exuberance of his learning than for the soundness of his judgment or the accuracy of his statement. His opinion in the case referred to is a singular confusion of the three subjects of delivery to pass title as between vendor and vendee at common law ; of delivery to satisfy the statute of frauds ; and of delivery to divest the vendor's lien or cut off the right of stoppage *in transitu*. It was denied in England, in *Townley v. Crump*, 4 Ad. & El. 58. It was severely criticised in Pennsylvania by LOWRIE, C. J., in *White v. Welsh*, 38 Pa. St. 396, 421. It was denied in the New York court of common pleas, in *Hamburger v. Rodman*, 9 Daly ( N. Y.) 93, 98 ; and it was finally denied in the same circuit where it was pronounced, on the authority of *Arnold v. Delano*, 4 Cush. ( Mass.) 33,—Mr. District Judge LOWELL saying : "I take the modern doctrine to be that, if the buyer stops payment before the seller has

actually parted with possession, though after he has parted with his title, if no rights of innocent third persons have intervened, his lien revives." *Parker v. Byrnes*, 1 Lowell ( U. S.) 539, 540. The third case, *Chapman v. Searle*, 3 Pick. ( Mass.) 38, though not overruled in terms, has been overruled in principle by the subsequent case of *Arnold v. Delano*, 4 Cush. ( Mass.) 33, and by subsequent cases in the same jurisdiction, which assert that the vendor's lien is not gone so long as he retains actual possession.

In determining whether a contract of sale has been executed so as to pass title to the goods, or whether there has been a delivery such as satisfies the statute of frauds, the courts frequently appeal to a principle thus stated by Mr. Chitty: "Although the contract for a sale of goods be complete and binding in other respects, the property in them remains in the vendor and at his risk, if a material fact remains to be done before the delivery, either to distinguish the goods, or ascertain the price thereof." Chitty on Contracts, 375, as quoted in *Southwestern Freight, etc., Co. v. Stanard*, 44 Mo. 71, 83. But this is not a conclusive inference. It is rather in the nature of a *prima facie* presumption, which may be rebutted by circumstances. For instance, the title may pass, although marking, weighing or measuring is thereafter to be performed, in order to ascertain the amount to be paid. *Ober v. Carson*, 62 Mo. 209, 213; *Thompson v. Baltimore, etc., Railroad*, 28 Md. 396, 404; *Southwestern Freight, etc., Co. v. Stanard*, 44 Mo. 71, 83. "Presumptively," says COOLEY, C. J., "the title does not pass, even though the articles be designated, so long as anything remains to be done to determine the sum to be paid; but this is only a presumption, and is liable to be overcome by such facts and circumstances as indicate an intent in the parties to be controverted." *Byles v. Colier*, 54 Mich. 1, 5. Moreover, the case where such a presumption arises is to be

distinguished from the case where there has been such a delivery as would authorize a jury to find that the parties intended that title should pass, and yet where the goods were left in the hands of the vendor to be the subject of some further treatment,—as where a piano sold to the vendee was left in the vendor's shop to be finished in a certain way. *Thorndyke v. Bath*, 114 Mass. 116.

By analogy, the courts have appealed to a similar principle for the purpose of determining whether there has been such an actual delivery as cuts off the right of stoppage *in transitu*, or divests the vendor of his lien. Thus, a broker effected a sale of thirty tons of rosin, and notified his principal as follows: "I have this day sold to David Bromer thirty tons of London-made rosin, more or less, at 13s. per cwt., lying in mats at the wharf of Lys & Co., payment by a bill at six months," —signed by the broker. Still later the plaintiffs (the vendors) sent an order to the wharfingers to weigh and deliver the rosin; upon which the latter gave notice to the vendee that they had received such order from the vendors. Shortly afterwards the vendee became insolvent, and, the rosin still lying at the wharf, the vendors gave the wharfinger notice not to deliver it. It was held that the property had not vested in the vendee, the decision proceeding upon the principle, "that the order sent by the vendor to the wharfinger, to deliver the goods, is sufficient to pass title to the vendee, provided nothing remains to be done but to make the delivery. If it be necessary by the terms of the contract, or by the order to the wharfinger, that anything should be done previous to the delivery, the transfer is not complete till *that thing* be done. It is impossible to say, in the present case, that something was not to be done. The order was to weigh and deliver; that act, therefore, which was to precede delivery, not having taken place, the property did not pass to Bromer." *Withers v. Lys,*

1. Holt. N. P. 18, opinion by GIBBS, C. J. It is perceived that, although the judge who decided this case placed his decision upon the ground that the right of property had not passed, the same reasons would have resulted in the conclusion that the vendor had not parted with his possession in a manner so entire as to cut off his lien.

A case was found in one of the legal periodicals where this principle was directly applied in solving the question whether a vendor had lost his right of lien. The decision was made by three referees, all of them eminent in the legal profession. Hon. WILLIAM F. ALLEN, subsequently a judge of the New York court of appeals; Hon. JOSEPH F. BOSWORTH, subsequently a judge of the superior court of the city of New York; and Hon. THEODORE W. DWIGHT, president of the law faculty of Columbia College, and sometime a judge of the New York commission of appeals. These referees delivered an opinion of exceptional ability, in which, on the facts before them, they resolved that the following propositions were established by the authorities : "Where the goods, at the time the contract of sale is made, though in the legal custody and control, are not in the actual possession of the vendor, but are so situated that the purchaser cannot obtain actual possession until a specific act is done by the vendor, if the vendee becomes insolvent before this act has been done, and the actual possession of the goods has not been changed, the vendor may detain the goods as security for the payment of the contract price, and, as a consequence, will not be compelled by a court of equity to perform the act in question. The right of detention, in case of the intervening insolvency of the vendee, may be exercised by the vendor, so long as the vendee has neither obtained actual possession, nor been furnished by the vendor with the exclusive means and power of controlling the possession." *Gill v. Pavenstedt*, 7 Am. Law. Reg. (N. S. ) 672, 676.

The facts in this case sustain a considerable analogy to the facts of the case now before us. A. had purchased a quantity of teas from B. The goods were placed in the bonded warehouse of a third person, and were there entered in the name of B., the vendor. The sale was upon a credit, at a specified price, and the duties were to be paid by the vendee as a part of the price. He had withdrawn, by permission of the vendor, portions of the goods at different times, paying the duties on such portions. Before the credit expired, the vendor gave to him an order on the bonded warehouse, directing the latter to transfer the residue of the goods to the name of the vendee, which was accordingly done. But, as between the parties and the government, the goods still remained in the name of the vendor, and could not be withdrawn from the warehouse under the regulations of the treasury department, except by what is termed a "withdrawal entry" signed by the vendor, or by some one authorized by him in writing. While the goods were in this condition, the vendee became insolvent. After his insolvency, he demanded that the vendor should sign the necessary withdrawal entry, which the latter refused to do, except upon full payment of the price. It was held that an act, to-wit, the signing of the withdrawal entry by the vendor, remained to be done, as between himself and the vendee, which was of such a nature that there was no delivery, either actual or constructive, and that the vendor's lien for the unpaid purchase money subsisted. *Gill v. Pavenstedt, supra.* We assume that, under the internal revenue statutes above set out, the withdrawal entry, in the case before us, could only be made by the distilling company in whose name the deposit entry was made; and this, as already shown, was—not C. Conrad & Co., simply, but " *The Silver Creek Distilling Company,* doing business as C. Conrad & Co."

In a case still more like the present, which turned upon this principle, certain distilled whiskey was stored in a government warehouse in Terre Haute, under the provisions of the internal revenue laws, in the name of the vendor, who paid the insurance thereon, and who sold the whiskey, so stored, to the vendee on a credit, and caused it to be inspected and gauged, as is required by the internal revenue laws; whereupon the government store-keeper certified that the whiskey was in the store house, "Mr. Edward Dewey, of Boston (the vendee) being the owner of said whiskey, as per Messrs. Mohr & Solomon's (the vendor's) order." It was a part of the contract of sale that the vendor should, from time to time as the vendee should request, ship the goods from the bonded warehouse and pay the warehouse charges, taxes, stamps and insurance, drawing on the vendee at ten days' sight for the amounts so paid. Down to this point, it is perceived that the whiskey was similarly situated to the whiskey in the case before us. It was, as here, in a government warehouse. The title, as here, had been transferred from the vendor to the vendee. The government warehouseman had attorned, so to speak, to the vendee, by issuing the certificates recognizing the vendee as the owner; and yet it was held that, drafts drawn against a shipment of the whiskey having been protested, these facts did not determine the vendor's right of stoppage *in transitu*, but that the vendors might stop them and maintain replevin for them, while they were yet in the hands of the carrier in Boston. The court, speaking through Mr. Justice MORTON, said: "Something remained to be done by the vendors under the contract of sale, before the goods would come into the possession of the vendee at the place of destination. The contract contemplated that they were to forward them to Boston. If the goods had been and remained in their actual possession as vendors until they forwarded them, on the

order of Dewey, their right of stoppage *in transitu* would have been unquestionable. The result is the same, though they remained stored in a government warehouse, unless the transfer to Dewey on the records of the warehouse is to be treated as a termination of the transit. But, as we have seen, the terms of the sale provided that the plaintiffs should forward the goods to Boston as their place of destination, and the storage in the warehouse was preliminary to their transit, and not the termination of it. It is no answer to this view to say that there was a constructive delivery of the whiskey to Dewey, which vested the property in him, and that he had the right to take possession of it and withdraw it from the warehouse." *Mohr v. Boston, etc., Railroad,* 106 Mass. 67, 71.

If this conclusion was a sound one,—and, in favor of the strong equity upon which the vendor's right of lien subsists, we do not see why it was not,—it seems, when applied to the contract in evidence in this case, decisive of the existence of the vendor's lien, unless we are to hold that a vendor has a better right of detainer *after* the goods leave his warehouse and get into the hands of a carrier, than while they are yet in his warehouse.

Let us next inquire how this principle applies to the contract before us. It stipulated for the doing of three things by the vendor before the delivery should be complete. These were : (1) To give care and attention to the packages while in the government warehouse : "That all care and attention shall be given the packages while in store, by the party of the first part." (2) To place insurance upon the property, if so required by the vendee : "That the party of the first part, if desired to do so by the party of the second part, shall place insurance, loss, if any, payable to the party of the second part, who shall pay the premium at not to exceed current rates." (3) And, finally, to complete the delivery of the property itself : "That, upon

release from bond and payment of United States and state taxes and storage, by the party of the second part, the packages shall be delivered, free of charges, by the party of the first part, on board the cars at Silver Creek, Kentucky." Presumptively, there had been no actual delivery of the property to the vendee until the last of these three things was performed, unless the other circumstances surrounding the transaction were such as to repel the presumption. Whether they were was a question of fact, which has been resolved against the plaintiffs by the trier of the facts, and his resolution is conclusive upon us.

It has been argued with much force that this last quoted clause of the contract, requiring the delivery of the goods free on board at Silver Creek, is to be regarded, when considered in the light of the facts of the case, as merely a contract to perform an additional service in respect of the property after delivery had in fact taken place. We do not say that the trial court might not have so regarded it. The case of *Cooper v. Bill*, 3 Hurl. & Colt. 721, required the subject of the sale (certain unsquared logs of timber) "to be delivered to boats when required." They were taken to the side of the canal and deposited on the bank near the landing, but not near enough to the boats, it would seem, to satisfy the requirement of the contract. While so deposited, the vendee, by his agents, took actual possession, marked the logs with his initials and expended five pounds in squaring them. It was held that there had been here such a delivery as divested the vendor of his right of lien. Although the case was very badly considered, so badly that it would seem that two of the judges had not in their minds any sound conception as to the nature of the vendor's lien,—yet the conclusion was obviously right, on the analogy of the rule in the law of stoppage *in transitu*,—that the vendee may intercept the transit and take possession before the

goods have arrived at the place appointed for delivery, which possession will end the right of stoppage of the vendor. If the removal of the whiskey in this case from the distillery to the bonded warehouse and thence to the cars, which the evidence shows would come to a side track by the side of the warehouse, could be regarded as a transit, and if it had appeared that C. Conrad & Co. had, by themselves or agents, intercepted the transit and taken actual possession of the whiskey while it was in the bonded warehouse,—this, of course, would have put an end to the vendor's lien, notwithstanding the provision of the contract requiring the vendors to deliver the goods free on board the cars. But no such facts appear in the record,—unless the collection of facts that the distillery was run in the name of C. Conrad & Co, that the warehouse had above its door the same name, that the whiskey was branded in the same name, and that the correspondence to and fro between Silver Creek, Kentucky, and St. Louis, was sometimes conducted as though the warehouse was actually that of C. Conrad & Co.,—were facts from which the trial court was conclusively bound to find an actual delivery of the whiskey to C. Conrad & Co. But to hold, as a conclusion of law, that the facts prove such a delivery, would make them prove too much; because it would make them prove that C. Conrad & Co. were the distillers, in contradiction of the contract under which the whiskey was made, which provided that Stagg, Hume & Co. should make the whiskey, and that, although they should use the name of C. Conrad & Co. as distillers, they should exonerate C. Conrad & Co. from all liability to the government for the conduct of the distillery. It would also involve the absurdity of holding that, while the warehouse was that of C. Conrad & Co., yet they were under obligations by the terms of the contract to pay storage for keeping their whiskey in it to Stagg, Hume & Co. In fact, it would turn the

whole transaction upside down, divest the parties of the character of vendor and vendee and turn them into the relation of principal and agent : C. Conrad & Co. being the principals and proprietors, and Stagg, Hume & Co. being merely their agents. Thus, if we do not ignore the language of the contract, throw it away, and get it entirely out of sight, we must, in order to uphold this contention, turn the whole transaction into elemental nonsense.

The question has been presented in another aspect by the very able argument which has been made on behalf of the plaintiffs. The contention is this: That where the goods which have been sold are deposited in the warehouse of a third person, to the use of the vendee, there has been a delivery such as cuts off the vendor's lien, under the English law, where there has been an *attornment* by the warehouseman to the vendee, and, under the American law, without such attornment; that the goods in this case were warehoused with a third party, which third party was either the government store-keeper, who had the keys and the actual possession of the warehouse, or else the Silver Creek Distilling Company, which was the owner of the warehouse; and that, by thus being placed in the warehouse of a third party, they were placed under the dominion and control of the vendee, so far as could be done while the government tax remained unpaid, which divested the possession of the vendors and with it their lien. We shall consider this question in the alternative aspect of the government store-keeper being the warehouseman, and of the Silver Creek Distilling Company being the warehouseman.

In the first aspect of the question, it is to observed that the effect of depositing goods in the custom house, or in a bonded warehouse, to secure the payment of government fees, has been several times considered by the courts in respect of a question which is strictly

analogous to the question of delivery to divest the vendor's lien, namely, the question whether, after goods have arrived at the end of a voyage, there has been such an actual delivery to the consignee as cuts off the right of stoppage *in transitu*; and it has been uniformly held that the fact of a deposit of the goods in a government warehouse does not determine the right. *Northey v. Field*, 2 Esp. 613; *Donath v. Broomhead*, 7 Pa. St. 301; *Harris v. Pratt*, 17 N. Y. 249; *Mottram v. Heyer*, 5 Denio, (N. Y.) 629. And it is well known that in such cases the consignor has generally nothing further to do, in order to get the goods out of the warehouse and into the actual possession of the consignee. The consignee really enters the goods at the custom house, as was done by his assignee in the case of *Harris v. Pratt, supra.* No strength, therefore, can be derived in favor of the hypothesis of the plaintiffs, from the fact that these goods were in the possession of the government storekeeper. It is to be observed that the government storekeeper is not a warehouseman for any purpose of commerce. He simply holds the goods in the course of transmission, so to speak, between the manufacturer and the consumer, until the government dues are paid. His position ought not to be construed so as to interrupt or impair the rights of vendor, vendee or pledgee, beyond what the terms of the statute under which he holds possession absolutely require. The language of Judge WAGNER in *Ober v. Carson*, 62 Mo. 209, 215, fully justifies us in this conclusion.

But a further argument has been pressed upon us, in favor of the plaintiffs, upon the sections of the federal statute, already quoted, which imply that the storekeeper, on the order of the collector, upon the payment of the government dues, is to deliver the goods to the *owner;* and, as it is not disputed that Conrad was the owner, the argument derived from this is that the government store-keeper held the goods in a sense as his bailee,

to be delivered to him or to his assignee upon the payment of the dues. This argument, like other arguments which have been pressed upon us in this case, proves too much for the case of these plaintiffs. We have already shown that, assuming the warehouse receipts which were delivered to them to be effective to make a symbolical delivery of the goods to them, yet this, under the evidence, did not make them the *owners*, but it merely made them *pledgees*. The well-known distinction between a pledge and a chattel mortgage is that in a chattel mortgage the title passes to the mortgagee, subject to a defeasance; while, in the case of a pledge, the title does not pass to the pledgee, but remains in the pledgor, but the possession passes to the pledgee for the purpose of securing the performance of the obligation intended by the parties. A pledgee, therefore, is not the owner, but the mere holder of a possessory lien. If this argument were a sound one, then these pledgees would not have had the right, in the event of an attempt upon the part of the pledgor to repudiate the pledge, to pay the taxes and take the goods out of the government storehouse. But such a pledge would be utterly ineffective and nugatory, unless the pledgees were accorded this right, and they could not be accorded this right without being regarded as the "owners" within the intendment of the statute. We hold that congress, in employing the word "owners," made use of a general word to avoid circumlocution and needless specification, and that this general word was a word of description, intended to designate any person who, upon the payment of the government dues, was in law entitled to the possession of the goods. When, in the cases before us, the sheriff in Kentucky levied upon these goods in the hands of the government store-keeper, and thereafter paid the taxes, they were properly delivered to him as the owner, within the intendment of the statute. And yet he was not the owner in the sense in which that word is ordinarily

employed, though he had the title for a limited and qualified purpose.

But if the Silver Creek Distilling Company is to be regarded as the warehouseman, then the conclusion is the same. The circuit court does not seem to have found, as a fact, what was the relation subsisting between the Silver Creek Distilling Company and Stagg, Hume & Co. Perhaps on the evidence either of the following conclusions was warrantable : (1) That the Silver Creek Distilling Company was the mere agent or servant of Stagg, Hume & Co. for the purpose of carrying out the contract subsisting between them and C. Conrad & Co.; or (2) that, in making this contract with C. Conrad & Co., Stagg, Hume & Co. were agents acting for an undisclosed principal, and that the Silver Creek Distilling Company was that principal. We do not see that it makes any difference in principle which of these views is taken. The fact remains that there was a substantial identity between Stagg, Hume & Co. and the Silver Creek Distilling Company, and that there was no privity between the Silver Creek Distilling Company and C. Conrad & Co. It does not appear that any letter was ever addressed by the Silver Creek Distilling Company to Conrad as such, or by him to them, and it is not clear from the record that he even knew of the existence of such a corporation. They were the mere fingers of Stagg, Hume & Co. to carry out their contract with C. Conrad & Co., or else Stagg, Hume & Co. were their mere agents to make the contract without disclosing them; and it does not seem to matter which, for the purposes of the question we are considering. If the Silver Creek Distilling Company were the real principals in the contract, then the case is that of the vendor holding the goods in his own warehouse. If they were the mere agents of Stagg, Hume & Co., then the case is that of Stagg, Hume & Co. holding the goods in the warehouse of their agent; for what a man does by his agent he does by himself.

In either case the possession was the possession of the vendor, and carried with it a vendor's lien. That the circuit court has taken this view is shown by the follow-instruction, given of its own motion :

"If the court finds from the evidence that the contract of October 25, 1882, between Stagg, Hume & Co. and Charles W. Conrad, admitted to evidence, was entered into by Stagg, Hume & Co., and that the whiskey in controversy was made under said contract at the instance and request of Stagg, Hume & Co. by the Silver Creek Distilling Company, and placed by it in its bonded warehouse at Silver Creek under said contract, and that Charles W. Conrad failed and suspended business in January, 1883, and that at the time of such failure Stagg, Hume & Co., or the Silver Creek Distilling Company, jointly with the store-keeper for the United States, were in actual possession of the said whiskey in the said bonded warehouse; and that the notes given by Charles W. Conrad, in settlement for the said whiskey, are now, and have always been, held by Stagg, Hume & Co.,—then, the court declares, as a matter of law, that, at the time of said Conrad's failure and suspension of business, the said Stagg, Hume & Co. had a vendor's lien on said whiskey and a right to retain possession thereof, either themselves or by or through said distilling company, until they were paid therefor; provided, the court further finds from the evidence that, at the time the warehouse receipts for the whiskey in controversy were issued to plaintiffs, Charles W. Conrad was, in fact, insolvent, and, further, that neither the distilling company, for itself or on behalf of Stagg, Hume & Co., nor Stagg, Hume & Co., after they, or either of them, became aware of such insolvency, did, with full knowledge of the circumstances under which said receipts were issued, ratify their issuance to Charles W. Conrad."

IV. We come now to the question of the effect of the symbolical delivery of the property to the plaintiffs

as determining the vendor's lien.   For the purposes of
making more clear the view which we take, we shall
assume that the evidence establishes that Stagg, Hume
& Co. authorized Conrad to issue warehouse receipts in
respect of the whiskey on store in the government ware-
house number 541, at Silver Creek, Kentucky.   Whether
the Silver Creek Distilling Company, as such, ever
sanctioned the issue of such warehouse receipts, it is
not material to inquire; since, as we have already stated,
there was no privity of contract between that corpora-
tion and Conrad.   If Stagg, Hume & Co. gave the
authorization, it concluded them, if they were the real
vendors; and it equally concluded the distilling com-
pany for which they were the agents, if the distilling
company were the real vendors.

We ought, perhaps, to state here that we do not
take the view upon which the circuit court proceeded,
and which is embodied in the above instruction, that the
symbolical delivery, which was attempted or effected
by means of these warehouse receipts, became inopera-
tive from the circumstance that, at the time of their
issue, Charles W. Conrad was in fact insolvent.   We
can find no such principle in the cases which expound
the nature of the vendor's lien and the analogous right
of stoppage *in transitu*.   Neither of these rights is of
such a nature as to be self-executing.   It is a right
which the vendor may or may not assert; and if he does
not assert it in time it is lost.   Stagg, Hume & Co. had
not asserted it when these warehouse receipts were
issued, and they could not thereafter assert it as against
the holders of these warehouse receipts, provided the law
placed them, in respect of the rights thereby acquired,
on a better footing than that which was occupied
by their transferors, C. Conrad & Co.

The general rule of the common law touching trans-
fers of personal property is that the transferee acquires
no better title than the transferor had; if the vendor had

no title, the vendee gets none; if the pledgor had no title, the pledgee gets none; if the vendor or pledgor had a title, but subject to a lien in behalf of another person, the vendee or pledgee takes it burdened with such lien. This is unquestionably the general rule; but the rule has its exceptions. One exception known to the English common law is the well-known case of sales in market overt; but this exception is a stranger to American law, because in this country there are no markets overt. Another exception, founded in the custom of merchants, arises in the case of strictly negotiable paper, whereby the transferee of a bill of exchange or negotiable promissory note, who receives it in due course of trade, for a valuable consideration, before maturity, and without notice of any infirmities attaching to it, takes it discharged of any equities which may exist in respect of it between the original parties to it. Another exception, founded also in the custom of trade and analogous to the exception relating to commercial paper, relates to the symbolical delivery of goods in the hands of a carrier, effected by a transfer of the bill of lading. Still another exception, having its foundation, in this country, in the general usages of trade, of which the court stake judicial notice ( *Gibson v. Stevens*, 8 How. (U. S.) 384, 399), but confirmed in nearly all the states of the union by statutes, relates to symbolical transfers of personal properly in warehouses, by the transfer of warehouse receipts. Following the precedent set by the great case of *Lickbarrow v. Mason*, (2 T. R. 63; s. c., 1 Smith Lead. Cas. 388), it is now the recognized law of this country that the owner of goods, or one having the legal right to sell or to pledge them, may invest another with the full title and constructive possession of them, by transferring to him a bill of lading or a warehouse receipt which has been issued as their symbolical representative, either by a carrier or a warehouseman in whose custody they are, so as to discharge the vendor's

lien or his right of stoppage *in transitu*, if the transferee of the bill of lading or warehouse receipt receives it *bona fide* and *for a valuable consideration.*

But what is to be deemed a valuable consideration, within the meaning of this rule, is one in respect of which the decisions are in a very unsatisfactory state. The question, whether one who takes an assignment of such a symbol of property, merely as collateral security for a past indebtedness, without making any present advance, agreeing expressly or impliedly for an extension of time to the transferor, or foregoing any benefit or advantage, is to be regarded as a purchaser for value within the meaning of this rule, is the one which we have now to decide; and it is a question upon which there is no direct authority in this state. Unfortunately, the authorities in respect of it in other jurisdictions are conflicting. The question has, within a comparatively short period, been decided both ways in England.

In *Rodger v. Comptoir d' Escompte de Paris*, L. R. 2 P. C. 393 (*anno* 1869), it was held by three judges, on an appeal from a colonial court, that one who takes a bill of lading merely as collateral security for a previous obligation, is not a purchaser for a valuable consideration in the sense which cuts off the vendor's lien. "Doubtless," said SIR JOSEPH NAPIER, in giving the opinion of the court, "the vendor's claim cannot prevail against the claim of a transferee for value, given on the faith of a negotiable security fairly and honestly taken; to the extent to which he has so given value, he has a prior claim. But the rule is founded on the reason of it, as already stated; *cessante ratione, cessat ipsa lex.* Where there is no advance made or value given upon the faith of the documents; where the object is simply, by a sweeping clause, to gather in whatever may be got to recoup the creditor of a debtor who had become insolvent, for an improvident advance made upon the faith of a totally different security; where,

upon the true construction of the assignment, no interest passed that would place the assignee in a better position that the assignor, and the bills of lading which subsequently came to hand were transferred expressly in performance of the agreement in this assignment and without other consideration whatsoever—it appears to their lordships that such a transfer, so made, and under such circumstances, cannot be held sufficient to defeat the vendor's claim." It is to be observed, however, that the case did not present the naked question we are here considering; since the assignee of the bills of lading knew that the assignment was made in contemplation of insolvency, and this, under a recent decision of our supreme court, would have deprived him of the position of a *bona fide* purchaser without notice. *Young v. Kellar*, 94 Mo. 581.

The question came before the English court of appeals, not long afterwards, in the case of *Leask v. Scott*, 2 Q. B. Div. 376, in which case the doctrine of the case last cited was denied, in an earnest and somewhat heated opinion by the Lord Justice BRAMWELL, who declared that the decision was "not only a novelty, but a novelty opposed to what may be called the silent authority of all the previous judges and writers who have dealt with the subject." In other words, he inferred that it was the law that one who takes a bill of lading as collateral security merely for an antecedent indebtedness is a purchaser for a valuable consideration, and takes it discharged of the vendor's right of stoppage *in transitu*—simply because the question had never before been decided in England one way or the other. As in the previous case, it is to be observed with reference to this case, that the record did not present the naked question; for there was a present consideration mingling with the antecedent indebtedness, so that the observations of the court upon the question, notwithstanding the positive terms in which they were

couched, were really no more than *obiter dicta*,—an opinion upon a case not before them.

In the federal courts we find but two direct decisions upon the question. In *Lessassier v. The Southwestern*, 2 Woods (U. S.) 35, 36, Mr. Justice BRADLEY at circuit ruled the following proposition: "A transfer of a bill of lading as a mere collateral for previous obligations, without anything advanced, given or lost, on the part of the transferee, does not constitute such an assignment as will preclude the vendor of the goods from exercising the right of stoppage *in transitu*." The contrary was held by Mr. District Judge NELSON, in the federal circuit court in Minnesota, by analogy to the rule laid down by the supreme court of the United States,. in *Railroad v. National Bank*, 102 U. S. 14, in respect of commercial paper. *St. Paul Roller Mill. Co. v. Great Western Despatch Co.*, 27 Fed. Rep. 434.

We do not find that the question has been distinctly decided in any of the state courts, except in the case of *Loeb v. Peters*, 63 Ala. 243; s. c., 35 Am. Rep. 17, where it was held that the transfer of a bill of lading by the consignee to his prior creditor, as collateral security merely for the prior indebtedness, does not cut off the vendor's right of stoppage *in transitu*—the creditor of the vendee in such a case not being a *bona fide* purchaser for value.

In the absence of any direct authority which is controlling upon us, we are thus under the necessity of deciding the question according to the best *analogies* we can discover in the decisions in this state and in other jurisdictions. There are four analogies which bear directly upon the question: (1) The analogy of goods purchased by means of fraudulent representations, such as will authorize the vendor, on discovering the fraud, to rescind the sale and reclaim the goods. (2) The analogy of conveyances of lands and goods

made with the design to hinder, delay or defraud creditors, the purchaser or transferee being innocent of knowledge of the fraudulent design. (3) The analogy of other conveyances of land, subject to unrecorded liens or equities unknown to the transferee. (4) The analogy of the transfer of commercial paper.

*First.* In respect to the first analogy, it has been unanimously held in the court of appeals of New York, in a case twice argued, that one to whom personal property has been delivered by a fraudulent vendor *in payment* of a precedent debt due him, or (what is tantamount thereto) in performance of an executory contract of sale, made by such fraudulent vendee prior to acquiring possession of the property, or of any symbolical representative of it, is not a *bona fide* purchaser for value, and cannot hold the property against the original defrauded vendor. *Barnard v. Campbell,* 55 N. Y. 456, s. c., on re-argument, 58 N.Y.73. It is to be observed that this case follows the analogies of the rulings in that state in respect of commercial paper, considered further on, under which a transfer even *in payment* of an antecedent indebtedness, does not divest equities subsisting in favor of the payor; which is not the law in this state. *Green v. Kennedy,* 6 Mo. App. 577.

*Second.* The analogy, in respect of conveyances of lands or goods in fraud of the creditors of the transferor, is illustrated by numerous decisions; and, so far as the writer has observed, they are all to the same general effect, which is that, to entitle the transferee to be treated as a purchaser for a valuable consideration, it must appear that he actually paid the purchase money before he had any notice of the fraud; it is not sufficient that he had agreed to pay it, or even that he had given his check in payment, unless the check had been paid. *Arnolt v. Hartwig,* 73 Mo. 485; *Dougherty v. Cooper,* 77 Mo. 528; *Young v. Kellar,* 94 Mo. 581;

*McNichols v. Rubleman*, 13 Mo. App. 515, 522. The decisions in other jurisdictions to the same effect are so numerous that we refrain from citing them.

*Third.* In respect of the third analogy, that of other conveyance of land, subject, in the hands of the grantor, to prior unrecorded conveyances, vendor's liens, resulting trusts or other secret equities,—our law, in like manner, speaks only in one way. In order to entitle the innocent grantee to protection against a prior unrecorded conveyance, vendor's lien or other equity, he must have parted with something of value as a consideration, before receiving notice of the prior conveyance of equity. *Aubuchon v. Bender*, 44 Mo. 560; *Halsa v. Halsa*, 8 Mo. 303; *Chouteau v. Burlando*, 20 Mo. 482; *Paul v. Fulton*, 25 Mo. 156; *Digby v. Jones*, 67 Mo. 107.

Professor Pomeroy, in his great work on equity jurisprudence, generalizing on this question, says: "A conveyance of real or personal property, as security for an antecedent debt, does not, upon principle, render the transferee a *bona fide* purchaser; since the creditor parts with no value, surrenders no right, and places himself in no worse legal position than before. The rule has been settled, therefore, in very many of the states, that such a transfer is not made upon a valuable consideration, within the meaning of the doctrine of *bona fide* purchase." 2 Pom. Eq. Jur., sec. 749. To this last statement the learned commentator cites a long list of judicial authorities, pointing out, at the same time, that there are some holdings to the contrary. Since real property has in modern times entered largely into the operations of commerce, it is not perceived why there should be upon such a subject one rule for real property and another rule for personal property; nor is it perceived why there should be one rule for negotiable choses in action and another rule for tangible goods; and while it is desirable that the decisions of the state

courts upon questions of commerce, and especially upon questions of commercial paper, should follow those of the federal courts, yet the state judicatories are not bound by the federal judicatories on these questions, and it could easily be pointed out that, on this particular question, so far as it concerns negotiable paper, a majority of the state courts deny the doctrine recently declared in the supreme court of the United States in *Railroad v. National Bank*, 102 U. S. 14.

*Fourth.* Proceeding now to the last and most direct analogy to the question before us, that of the transfer of commercial paper, we regret to find that the question whether the transferee of such paper, who takes it merely as collateral security for an antecedent indebtedness, acquires title to it discharged of prior equities, —is settled differently in different American jurisdictions, and does not seem to be settled at all in this state. The decision of the supreme court of the United States in *Swift v. Tyson*, 16 Pet. (U. S.) 1, is generally quoted as the leading case in favor of the position that such a taker of negotiable paper takes it discharged of equities. That case did not, however, decide the question ; since the question in judgment was whether one who thus takes negotiable paper, *in payment*, takes it discharged of equities ; although there is a *dictum* of Mr. Justice STORY, who gave the judgment of the court, that the rule would be the same in case it were taken as security merely for an antecedent indebtedness. Mr. Justice CATRON regarded this *dictum* as so objectionable that he made it the subject of a special dissent. The question remained *undecided* in that tribunal as late as the case of *Oates v. National Bank*, 100 U. S. 239, 249, where it was expressly left as an open question ; but soon afterwards, in the case of *Railroad v. National Bank*, 102 U. S. 14, 25, it was resolved in favor of the *dictum* of Mr. Justice STORY, and contrary to the holdings of the courts of New York and many other states

The opposing lines of American authority on this question appear to commence with the leading case of *Coddington v. Bay*, 20 Johns. [N. Y.] 637, where it was held by the highest court of that state, reversing a decision of Chancellor KENT (*Bay v. Coddington*, 5 Johns. Ch. 54), that one, who takes a negotiable instrument merely as collateral security for an antecedent indebtedness due to him from the person endorsing it to him, takes it subject to any equities which may exist between the original parties in respect of it. The same court, out of deference to the later decision of the supreme court of the United States in *Swift v. Tyson*, *supra*, again went over the whole ground, reviewing many authorities, and, while conceding the desirability of the state courts following the ruling of the higher federal tribunals on commercial questions, declined to recede from its previous holdings, but re-affirmed the following proposition : An innocent holder of negotiable paper, who has received it in the usual course of trade, for a valuable consideration, though from a person having no title and no authority to transfer it, will be protected, even as against the claim of the previous owner; but if it appear that the paper was received merely as collateral security for an antecedent debt, due from the person who made the unauthorized transfer, and that the transferee neither parted with value on the credit of receiving it, nor relinquished any previous security, he will not be deemed a purchaser for value and will not acquire a title to the paper as against the real owner. *Stalker v. McDonald*, 6 Hill [N. Y.] 93, 96. It would not be profitable, in a judicial opinion, to follow through the rulings of the different states the two divergent lines of authority thus started. We shall limit our inquiry to the law of Missouri and the law of Kentucky.

The initial case in this state is *Goodman v. Simonds*, 19 Mo. 106. In that case our supreme court had a case

before it which, in its judgment, called for a decision of this question. The court, citing the New York decisions above given, and also citing, but not following, *Swift v. Tyson, supra*, ruled that the transferee of commercial paper as collateral security for an antecedent debt is not a taker for value. In the opinion of the court by RYLAND, J., the following strong language occurs: "A man catching at every chance to save himself never inquires, so he can obtain collateral security, about the fairness of the transaction. He gives nothing for it; he risks nothing for it. Then, common sense and common honesty unite in saying he shall take it with the defenses the other parties have against it in the hands of the original holder and party. We do not say that a bill of exchange, passed to a person in the payment of a pre-existing debt, would be liable in his hands, without notice, to the equities or defenses of the original parties; but that the holder of a bill merely as collateral security for a pre-existing debt, having given no value for it, no consideration for it, holds it liable to such equities. We know that there are authorities whose phraseology may be construed against this view, but we also know that there are authorities in its favor, and we think reason and justice unite in supporting it." *Ib.* 116. In a case between the same parties and apparently on the same instrument (though how this came about does not appear) which went from the circuit court of the United States for the district of Missouri to the supreme court of the United States (*Goodman v. Simonds*, 20 How. [ U. S.] 343 ), the court refrained from deciding this question, being of opinion that it was not presented by the record. The question next came before the supreme court of Missouri for decision in *Grant v. Kidwell*, 30 Mo. 455, and it was ruled, in a short and ill-considered opinion, delivered without referring to the leading authorities on the question, and without making any allusion to *Goodman v.*

*Simonds*, that the endorsee of a negotiable promissory note assigned before maturity, as an indemnification against an antecedent liability, takes it discharged of prior equities. The question next came before the supreme court in *Boatmen's Savings Institution v. Holland*, 38 Mo. 49. The plaintiff had taken the note from the payee as collateral security for an antecedent debt, and was now suing the maker upon it. The maker offered certain evidence, for the purpose of showing that the note had been given to the original payee upon a consideration which had failed. It was held that the trial court rightly rejected this evidence. WAGNER, J., said: "It was wholly irrelevant, and, had it been introduced, it would not have constituted the shadow of a defense. A pre-existing debt, or an antecedent liability, incurred by an endorsee of a negotiable note assigned before maturity, is a sufficient consideration to support the title of such endorsee." The court cited *Swift v. Tyson, supra*, and also its previous decision in *Grant v. Kidwell*, but made no reference to *Goodman v. Simonds, supra*, although it had been cited in the printed briefs.

If the question rested here, it would be entirely clear that, so far as bills of exchange and promissory notes are concerned, the transferee in pledge for an antecedent indebtedness gets as good a title as one who parts with the present value. But these decisions are succeeded by a line of *dicta* and decision which tend to create the impression that the courts regard the doctrine of *Goodman v. Simonds* as still the law of this state. The principle of that decision was recognized by the supreme court in *Logan v. Smith*, 62 Mo. 455, 458, and in *Davis v. Carson*, 69 Mo. 609, 610; by this court in *Terry v. Hickman*, 1 Mo. App. 119, 124, the court saying that it was "controlling authority;" was acted upon by this court as authority in the decision of *Brainard v. Reavis*, 2 Mo. App. 490, 493—where the

court, with singular inconsistency, cited in the same con-
nection *Grant v. Kidwell*, *supra*. Again, in *Hodges
v. Black*, 8 Mo. App. 394, there is a *dictum* that "one
who takes a note before maturity, merely as collateral
for a pre-existing debt, where the facts are such as to
raise no new consideration, is not regarded in Missouri
as a holder for value free from all equities between the
original parties,"—citing *Terry v. Hickman*, *supra*.
This case was affirmed by the supreme court, adopting
the opinion of this court, in 76 Mo. 537. Again, in
*Skilling v. Bollman*, 73 Mo. 665, 670, the rule in
*Goodman v. Simonds*, was recognized by the court in
the following language from the opinion by HENRY,
J. : "Eminent jurists and judicial tribunals hold that
one who, for a prior indebtedness, receives a bill of
lading for goods, either as collateral security, or in
payment of such indebtedness, has no such title as will
avail, even against the vendor's right of stoppage *in
transitu;* in other words, that such a one, in such
controversy, is not to be regarded as a *bona fide* pur-
chaser for value. (Citing cases.) And *Goodman v.
Simonds*, 19 Mo. 106, and *Logan v. Smith*, 62 Mo. 455,
recognize the principle pronounced in the foregoing
cases." The rule in *Goodman v. Simonds* was again
recognized and distinguished in *Deere v. Marsden*, 88
Mo. 512, the court holding that, where a present consid-
eration, as an agreement express or implied for a delay,
however short, supervenes, the rule of that case does
not apply. Still later, in *Crawford v. Spencer*, 92 Mo.
498, 509, our supreme court made a similar ruling, follow-
ing *Deere v. Marsden*, *supra*, and quoting from the
decision in *Goodman v. Simonds*, *supra*, the latter
portion of the passage which we have quoted from it in
this opinion. Finally in *Feder v. Abrahams*, 28 Mo.
App. 454, 457, where the question was whether a
transfer by a failing debtor to one of his creditors, in
payment, makes the transferee a purchaser for value, it

was said by ROMBAUER, J.: "Plaintiff claims that the decision in *Deere v. Marsden*, 88 Mo. 512, questions the rule stated in *Hess v. Clark*, 11 Mo. App. 492. This, however, is in an obvious mistake. The supreme court in that case simply re-affirmed the proposition, which has been the law of this state since *Goodman v. Simonds*, 19 Mo. 107, that one who takes collaterals for a pre-existing debt, without any new consideration to support the transfer, is not a purchaser for value of such collaterals." The case which was thus regarded as pronouncing what has ever since been the law of this state was, as I have above shown, *twice* overruled upon cases in judgment, *once* thereafter re-affirmed and applied, and *nine times* thereafter expressly or impliedly recognized as the law. The manner in which our courts have thus dealt with a question of such great importance to the commercial community affords a striking illustration of the imperfect way in which judicial work has been done in this state produced, no doubt, largely by the over-crowded state of the dockets of the courts, and the excessive amount of work thrown upon the individual judges. If the doctrine of *stare decisis* were strictly adhered to, it would unavoidably result in the conclusion that one who takes *negotiable paper*, as collateral security for an antecedent indebtedness, takes it as a purchaser for value; for such was ruled in our supreme court in *Boatmen's Savings Institution v. Holland*, 38 Mo. 49, where the question was before the court in judgment, which is the last controlling decision upon the subject. But in view of the manner in which our supreme court has subsequently dealt with the question, I do not think that we are at liberty to hold that it is concluded by that decision. We should rather regard it as still an open question.

If we were to rest our decision upon the analogy of commercial paper and upon the authority of *Boatmen's Savings Institution v. Holland, supra*, it would result

in a reversal of the judgment of the circuit court in this case; because it would indisputably appear that the plaintiffs became *bona fide* purchasers for value of the whiskey in controversy, when they received from Conrad the warehouse receipts as collateral security for what he owed them, and especially since the circuit court refused an instruction, tendered by the plaintiffs, asserting this principle. But if we were to take this course, we should place ourselves in the inconsistent position of deciding (perhaps erroneously) the question upon the law of Missouri in one of its controlling aspects, and upon the law of Kentucky in another; for, on the question we are considering, the law of Kentucky is settled that one who takes commercial paper, merely as security for an antecedent indebtedness, is not a taker for value, but holds it subject to prior equities. *Lee v. Smead*, 1 Metc. (Ky.) 628; *May v. Quinby*, 3 Bush. (Ky.) 96. When we considered, in a former portion of this opinion, the question of the validity of these warehouse receipts as creating pledges of the property in favor of the plaintiffs, we found that, under a decision of this court, supported by decisions in other jurisdictions, they were invalid; but we also found that they were valid by the law of Kentucky, which law, however, had not been proved as a fact in the trial court. We therefore found that we could not affirm the judgment on that point, since the question had not been raised in the trial court, and, if it had been there raised, the objection could have been obviated by the plaintiffs putting in evidence the law of Kentucky, by which law, it is agreed, the rights of the parties are governed. Upon the same principle, we must now hold that we cannot reverse the judgment as being against the law of Missouri on the point under consideration ( the analogy of commercial paper ), since, if we were to take this course, the defendants could, on another trial of the cause, put in evidence the law of Kentucky, which on this subject is contrary to the law

of Missouri. We cannot, especially, take this course in the unsettled state of the law of Missouri. If the law of Missouri is that the taker of commercial paper, as collateral security merely, is a purchaser for value, within the rule which protects him against prior equities, and if this is a controlling analogy in dealing with the subject of warehouse receipts, nevertheless, knowing as we do that the law of Kentucky, by which the question in this case is governed, is to the contrary, we should be bound to say that the decision of the court upon this point, if erroneous in the precise state of the record, was a harmless error.

We now have to dispose of an argument of counsel for the plaintiffs, based upon the assumption that we are to follow the analogy of commercial paper in deciding the question under consideration. It is this: That the rule, under which the transferee of commercial paper for an antecedent indebtedness takes it subject to equities, applies only in the case of accommodation paper where there is a *fraudulent deviation*, that is to say, where the paper has been given to the payee for a limited or special purpose, and he has, in fraud of the rights of the maker, transferred it for a different purpose. The courts which take this distinction affirm the rule that an endorsee of a negotiable note made for the accommodation of the endorser, but without restriction as to its use, taking the note in good faith as collateral security for an antecedent debt, and without other consideration, is entitled to the position of a holder for value, and is not affected by the defense of want of consideration set up by the maker. *Grocer's Bank v. Penfield*, 69 N. Y. 502; *Pitts v. Vogelsong*, 37 Oh. St. 676; *Dunn v. Weston*, 71 Me. 273. See also *Freund v. Bank*, 76 N. Y. 352; 14 Am. Law Rep. 486. The argument is that, as the evidence of the plaintiffs tends to show that Stagg, Hume & Co. conferred upon Conrad an unlimited authority to issue warehouse receipts in respect of the whiskey in

the bonded warehouse at Silver Creek, this unrestricted authority necessarily included the right on his part to pledge it for his antecedent debts. We know of no rule of law which requires us to take this view. The most that can be said in favor of this view is, that it would be the conclusion of fact to be drawn from other facts, and whether the conclusion ought to be drawn was a question for the trial court, and not for this court. But it is to be observed that the conclusion would, upon the evidence in this record, be in the nature of a violent presumption. There is no evidence whatever in this record that any member of the firm of Stagg, Hume & Co. ever gave or intended to give to Conrad authority to do *what was done*—to pledge, in contemplation of insolvency, the whiskey which they had made for him on credit, and which remained in their warehouse, to his relatives and friends for his antecedent debts. Suppose that he had solicited authority from them to do this, could any one for an instant believe that they would have granted it? It is further to be observed that any course of reasoning, which holds that, because they did authorize him to use warehouse receipts merely as a means of transferring title to these goods while in their warehouse *in the ordinary course of trade*, they are to be held as having authorized him to use them for the destruction of their own legal rights,—is a course of reasoning which would destroy the vendor's lien in every case; because, as we have observed, the very existence of a vendor's lien always assumes that the title to the goods has passed to the vendee, since a man cannot have a lien on his own goods. The vendor has sold the goods to the vendee on credit, marked them, designated them, set them apart, and placed them under his dominion and control in such a sense that the title has passed and that there has been an executed sale. What is this but to say to the vendee; "Take the goods; they are yours; deal with them as you choose; here is a writing saying

that I have sold them to you." But notwithstanding all this, if, while they are yet in the actual possession of the vendor, he were to sell them, or to mortgage them, even in the course of trade, by any process which does not amount to a transfer of the possession of them in theory of the law,—on the plainest principles, the vendor's lien would revive upon his insolvency, even as against the sub-vendee. The sub-vendee would stand in the shoes of his vendor and get no higher title than his vendor. *Dixon v. Yates*, 5 Barn. & Ad. 313; *Hamburger v. Rodman*, 9 Daly (N. Y.) 93; *Southwestern Freight, etc. Co. v. Stanard*, 44 Mo. 71. In other words, it is the transfer of *possession*, and not merely the transfer of *title* which cuts off the vendor's lien; and, in nearly every case of executed sale, the vendor gives the vendee the *power* of transferring possession, and that was all that was given in this case in the authority to issue warehouse receipts. They were a mere means put into Conrad's hands of delivering constructive possession to others.

Recurring, then, to the analogies in which we have sought for a rule of decision upon the question whether the rights of the plaintiffs as holders of these warehouse receipts are superior to the rights of Stagg, Hume & Co., as unpaid vendors in possession, we find that they are all in favor of the conclusion that the rights of the unpaid vendor are superior, and that the plaintiffs are not to be regarded as purchasers for value, except the one which relates to the assignment of commercial paper; and that, while the law on this subject is unsettled in this state, it is settled in accordance with the other analogies in Kentucky, by the law of which state the rights of the parties are governed. We therefore hold that the plaintiffs are not to be regarded as purchasers for value, and that the vendor's lien of Stagg, Hume & Co., founded on actual possession, took precedence of their constructive possession as pledgees.

In the case already alluded to, which was twice before this court and the supreme court (*Skilling v. Bollman*, 6 Mo. App. 76; s. c., affirmed, 73 Mo. 665; s. c., *sub nom. Skyles v. Bollman*, 12 Mo. App. 598; affirmed, 85 Mo. 35), the court merely decided that one who takes a bill of lading, as collateral security for an antecedent debt, gets a better title than one to whom the consignor has subsequently transferred a *duplicate exemplification* of the same bill of lading in fraud of the rights of the first taker, although the second taker gets actual possession of the property—a principle several times affirmed in the English courts, and a very simple one; for the title of a person to property lawfully acquired is not to be divested, even in favor of an innocent person, by a subsequent fraud of the transferor, for which the first taker is not responsible. The second taker gets nothing, because his vendor has nothing to transfer. *Nemo dat quod non habet*. *Whistler v. Foster*, 14 C. B. (N. S.) 248.

V. One question remains to be considered. It is strongly urged that, even if we take this view, yet, notwithstanding this, the plaintiffs are entitled to be regarded as having a better right on the principle of *estoppel*. In our opinion the record does not show a state of facts on which an estoppel can be predicated. The doctrine of equitable estoppel cannot be invoked, unless what was said or done by the party to be estopped can be shown to have influenced the conduct of the other. *Eitelgeorge v. Building Ass'n*, 69 Mo. 52; *Spurlock v. Sproule*, 72 Mo. 503; *Acton v. Dooley*, 74 Mo. 63; *Rogers v. Marsh*, 73 Mo. 64; *Noble v. Blount*, 77 Mo. 235. It must have had the effect of misleading the party asserting the estoppel. *Hydraulic Press Brick Co. v. Newmeister*, 15 Mo. App. 592. This one element of an estoppel is nowhere presented by the record in this case. It is not shown—and if it was the fact it was for them to show it—that the plaintiffs

altered their position in any way to their disadvantage on account of the representation which Stagg, Hume & Co. may have held out to them, by publishing Conrad as the owner of this warehouse and of the whiskey stored therein, and by allowing him to issue warehouse receipts as such owner. If an estoppel, such as is now claimed, can be built upon a presumption or a surmise, it is easy to see that it would totally destroy the rule, applied in so many situations as already seen, which places a subsequent purchaser in the shoes of his vendor; for a case can scarcely be imagined—and this must be especially true in cases where commercial paper is transferred as collateral security for antecedent debts —where an attenuated estoppel could not be conjured up to destroy the rule of many jurisdictions which deprives such a transferee of the advantages of a *bona fide* holder for value.

We have thus endeavored to track this most difficult and complicated case over all the ground outlined by the counsel in their arguments. We are greatly indebted to the counsel on both sides for the aid which their learning, ability and industry have afforded us in arriving at the final solution of the questions presented. We have endeavored to decide the case in accordance with settled rules of property, without throwing into the scale any loose conceptions of justice or equity. We cannot, however, refrain from observing in conclusion that the result at which an adherence to legal principles, as we understand them, enables us to arrive, is in consonance with what seems to be the plain justice of the case. The vendor's lien, like the analogous doctrine of stoppage *in transitu*, is favored in the law. *Mullir v. Pondir*, 55 N. Y. 325, 337; *McEwan v. Smith*, 2 H. L. Cas. 309, 328, per Lord CAMPBELL; *Calahan v. Babcock*, 21 Oh. St. 281; s. c., 8 Am. Rep. 63, 65. It does not rest upon any strictly logical basis. It has been the outgrowth of a struggle for justice. It is founded

Conrad v. Fisher.

in the obvious conception of justice, that one man's goods ought not to be applied to the payment of another man's debts. *Heinz v. Railroad Transfer Co.*, 82 Mo. 233, 236. It was, indeed, said by one English judge that "it has always been certain that the owner might retake his goods, on their passsge, by any means short of felony, if he had subsequent grounds for believing that the purchaser would not perform his part of the contract by paying for them." GIBBS, C. J., in *Litt v. Cowley*, 1 Holt. N. P. 338; s. o., 7 Taunt. 169. It was, in like manner, said by a judge, who has been regarded as the father of the system of equity jurisprudence, that if the vendor "had got the goods back again by any means, provided he did not steal them, I would not blame him." Lord HARDWICKE in *Snee v. Prescot*, 1 Atk. 245, 250. And yet, if the present actions had been allowed to be well founded, the very consequence against which the courts of justice have struggled would have taken place in this instance. One man's goods would have been wrested from his actual possession in order to pay another man's debts.

It results from the foregoing that the judgment of the circuit court must be affirmed. Judge PEERS concurs. Judge ROMBAUER, having been of counsel, did not sit. It will, perhaps, be more satisfactory to the parties to state that Judge LEWIS, who was a member of the court when the cause was first submitted, after examining the record and the printed arguments, was also in favor of affirming the judgment.

[The Reporter is directed by Judges THOMPSON and BIGGS to state that, pending a motion for rehearing, Judge BIGGS succeeded Judge PEERS as a member of the court; the motion was taken under advisement for a considerable time, and all the questions involved in the case were gone over by Judge BIGGS, as though the case had been newly presented; and that he concurred in overruling the motion, for the reasons stated in the foregoing opinion.]